Robert MacDONALD, Plaintiff,

v.

**CHICAGO PARK DISTRICT, a body political and corporate, Defendant.**

No. 97 C 2963.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 15, 1997.

Wayne B. Giampietro, Witwer, Poltrock & Giampietro, Chicago, IL and Richard J. Wilson, Orlando, FL, for Plaintiff.

Steven A. Weiss, Schopf & Weiss, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

Before the Court is Plaintiff's Second Application for Preliminary Injunction, pursuant to Federal Rule of Civil Procedure 65. For the reasons set forth below, this Court grants in part, and denies in part, Plaintiff's Second Application for Preliminary Injunction.

### JURISDICTION AND PROCEDURAL HISTORY

This matter is brought under 42 U.S.C. § 1983, and alleges a violation of rights secured by the First Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment. Plaintiff, Robert MacDonald in his underlying Verified Complaint for Declaratory Judgment and Permanent Injunction ("Complaint"), seeks a declaration that the Chicago Park District's (the "Park District") grounds for permit denial, set forth in Chapter VII, § C(5)(e), of the Chicago Park District's Ordinance (the "Ordinance"), is unconstitutional. Mr. MacDonald also seeks an injunction permanently prohibiting the Park District from enforcing that portion of the Ordinance.

On March 4, 1997, Mr. MacDonald applied to the Park District for a permit to hold "Hempfest/Stop the Drug War Rally and March" on May 10 and 11, 1997. On March 12, 1997, the Park District denied his permit application. On March 18, 1997, Mr. MacDonald appealed the denial of his permit application to the General Superintendent of the Park District. That appeal was denied on March 26, 1997.

One month later, on April 25, 1997, Mr. MacDonald filed a Complaint, simultaneously filing therewith his Emergency Application for Preliminary Injunction (the "First Application"). The First Application was referred to this Court on April 29, 1997, and an evidentiary hearing was held on May 6, 1997. This Court issued a Report and Recommendation on May 9, 1997, recommending that the First Application be denied because of its untimely filing, one month after denial of the appeal, and only fifteen days before the rally at issue was to begin.[1]

On May 23, 1997, Mr. MacDonald filed the instant Second Application for Preliminary Injunction (the "Second Application"), in which he requested an order enjoining the Park District from enforcing its permit ordinance, and permitting him to hold a rally on August 23 and 24, 1997.[2] On July 2, 1997, the parties consented to the exercise of jurisdiction by this Court concerning the Second Application. On July 21, 1997, an evidentiary hearing was held on the preliminary relief requested in the Second Application.

### FINDINGS OF FACT [3]

#### I. *Background*

Mr. MacDonald wishes to hold another rally addressing drug policy reform, specifically the legalization of marijuana, in a public park controlled by the Park District.[4]

One year ago, in August of 1996, the Park District issued two permits to Mr. MacDonald to hold similar events. After those events—the "Festival of Life" and the "Yippie! Festival of Life"—the Park District's Deputy General Counsel, Joan Fencik,[5] mailed Mr. MacDonald written notice that his security deposit would not be returned. That letter, dated September 17, 1996, stated that the Park District was retaining Mr. MacDonald's security deposit due to ex-

penses incurred by the Park District for: delivery and use of portable toilets; opening and cleaning the underground bathrooms at Butler Field; cleaning the stage and seating area at Butler Field (adjacent to Petrillo Bandshell) after the events; and restoring that seating area to its usual configuration. Ms. Fencik's letter also stated that, at the events, multiple violations of the permits' terms occurred, including: alcohol consumption; unpermitted vendors; unpermitted vehicles; unpermitted tents and canopies; improper location of the generator, in violation of the fire code; and loitering by individuals who remained in the park past 11:00 p.m. No hearing was held prior to these determinations, nor was Mr. MacDonald ever found guilty of violating any ordinance. The Park District never sought to impose any fine against Mr. MacDonald (other than the forfeiture of his security deposit) for the alleged multiple violations of the terms of the permit.

On March 4, 1997, Mr. MacDonald applied to the Park District for a permit to hold "Hempfest/Stop the Drug War Rally and March" on May 10 and 11, 1997 (from noon until 10:00 p.m. each day). Mr. MacDonald sought to hold the rally at Butler Field, in Grant Park's Petrillo Bandshell. The purposes of the rally were, again, to provide a forum for public speech on drug policy reform, including the legalization of marijuana, and to raise money for this cause. The rally was expected to draw approximately 10,000 people and would have featured live music, as well as vendors occupying about fifty tents.

Eight days after he submitted his permit application, Ms. Fencik denied Mr. MacDonald's permit by letter dated March 12, 1997. Ms. Fencik cited three reasons for denial of Mr. MacDonald's permit: (1) multiple violations of the two permits issued to

---

1. The district court adopted this Court's Report and Recommendation on May 30, 1997.

2. While the Application indicates that Mr. MacDonald is seeking a permit to hold the rally on August 24 and 25, 1997, the parties agree and have stipulated that the actual dates are August 23 and 24, 1997.

3. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

4. The location in Butler Field that Mr. MacDonald wishes to use encompasses Grant Park's Petrillo Bandshell. Grant Park, like other parks within the City of Chicago, is exclusively under the Park District's control. Grant Park is a traditional public forum.

5. Ms. Fencik is now General Counsel to the Park District.

him in August of 1996; (2) failure to provide proof of his unincorporated association's tax-exempt status; and (3) inability of his association to enter into contracts. However, during the May 6, 1997 hearing, Ms. Fencik conceded that the latter two grounds did not provide a legitimate basis for denying Mr. MacDonald's permit. Thus, the Park District's denial of the permit rested upon the alleged existence of prior violations. This ground for denial is expressly provided for in § (C)(5)(e) of the Ordinance.[6]

Although his First Application was not granted, Mr. MacDonald held a rally, on May 10 and 11, 1997. (Tr. at 10–11.) During the rally, the Park District cooperated with Mr. MacDonald, and assisted him by opening up bathrooms, bringing in garbage cans, "allow[ing] him to have a bullhorn", and allowing sound amplification (through portable speakers attached to poles). (Tr. at 11–12.) No trespassing or other complaint was made against Mr. MacDonald for this event.

On May 23, 1997, Mr. MacDonald filed the Second Application, which is currently before the Court, seeking an order compelling the Park District to issue a permit to hold a rally at Butler Field on August 23 and 24, 1997 (in supporting memoranda, Mr. MacDonald also seeks to enjoin Chapter VII, § C(3) of the Ordinance and to compel the Park District to also allow a rally on May 9 and 10, 1998). He has not submitted a permit application for either rally.

The Grant Park Symphony Orchestra and Chorus is scheduled to perform at Butler Field, in Petrillo Bandshell, on the evenings of August 23 and 24, 1997. (Stipulation of Facts, para. 4.) There is a rehearsal of the Orchestra scheduled from 11:30 a.m. until 2:00 p.m. on August 23, 1997. (Id.) Testimony from Ms. Fencik supports a finding that prior unrelated events in Butler Field have in the past disrupted the symphony.

## II. *Permit Scheme*

The Park District requires a group of more than fifty people that desires to assemble, or anyone who wishes to use amplified sound other than for his/her own personal enjoyment, to obtain a permit for use of the public park. An application for a permit must be submitted between ten to sixty days in advance of the event, depending on whether the event is a "picnic", an "athletic event", or a "festival."

The Park District is supposed to make a decision regarding the permit application within fourteen days. However, it can extend the decision-making period for an additional fourteen days. The Park District need not provide any reason for such an extension (Tr. at 63.)

Permit fees and application deadlines are broken down by category, according to the schedule of fees. There are slightly conflicting descriptions on each of the fee schedules submitted into evidence. (Def.'s Ex. 4; Pl.'s Supp. Mem. at Ex. A.). Group weddings and picnics involving 50 people or more pay a $10 application fee, a user fee of $50 per 250 attendees, a security deposit of $100 per 250 attendees, and are required to have a $1 million certificate of insurance. The group picnic and wedding application (and the application fee, user fee, security deposit, and insurance certificate) are due no less than 14 days before the event. Athletic events—races and corporate-sponsored tournaments that do not include vendors, stage, amplified sound [7] or alcohol—pay a $53 application fee, a $1,050 user fee, a $1,575 security deposit, and are required to have a $1 million certificate of insurance. The athletic event application and application fee are due no less than 45 days before the event. Corporate Festivals with one stage, one source of amplified sound, less than 10,000 square feet of tents, (no corporate giveaways/sampling/signage, alcohol or rides allowed) pay a $105

**6.** The Park District is empowered to establish rules and regulations in furtherance of its responsibility to administer the public parks of Chicago. 70 ILCS 1505/7.02 (1993). Accordingly, the Park District enacted the Ordinance.

The Park District adopted revisions to the Ordinance, in particular Chapter VII, § C, on June 11, 1997. (Stipulation of Facts, para. 1.) Citations herein are to the revised Ordinance.

**7.** Although the Park District reasons that amplification involves electricity and, therefore, safety issues, the amplification requirements relate not only to state of the art sound systems, but also to battery operated bullhorns.

application fee, a $525 per day user fee, a security deposit of $1,050 and are required to have a $1 million certificate of insurance. Corporate festivals with one stage, one source of amplified sound, up to 25,000 square feet for tents, (alcohol, corporate sponsorship, and signage are okay) pay a $105 application fee, a $4,200 per day user fee, a $1,575 security deposit, and are required to have a $2 million certificate of insurance. Similar corporate festivals with multiple stages or sources of amplified sound pay a $105 application fee, a $8,400 per day user fee, a $1,575 security deposit, and are required to have a $2 million certificate of insurance. All applications and application fees for corporate festival permits are due no less than 60 days before the event.

Media permits for non-news, live or de-layed broadcasts, pay a $26 application fee, a $105 user fee, a $105 security deposit and are required to have a $1 million certificate of insurance. Commercial/movie/video permit seekers pay a $105 application fee, a $750 per day user fee, a security deposit of $1,050 and are required to have a $1 million certificate of insurance. Still photographers pay a $26 application fee, a $105 per day user fee, a $105 security deposit, and are required to have a $1 million certificate of insurance. All materials and fees for these media permits are due no less than 10 days before the event.

All applications must be accompanied by an application fee. The application fee is supposed to cover costs relating to checking whether park space is available and appropriate for the desired event, coordination and meetings with other agencies, such as the Department of Streets and Sanitation, and police, and notification to park staff—land-scapers and security—about the event. (Tr. at 17–20.) However, Ms. Fencik admitted that, if an individual with a bullhorn walks around a park to convey his message, the Park District would not incur any significant administrative costs. (Tr. at 79.) It also does not cost the Park District anything if people just show up and hang out in the park—its part of "ordinary wear and tear on the parks . . . We just empty their garbage, put toilet paper in the bathrooms." (Tr. at 79–80.)

The user fee, which is in addition to the application fee, includes costs for wear and tear, "coordination, clean up, landfilling, waste, [and] additional security." (Tr. at 21.) "[T]he Park District has its own security force." (*Id.*) The security personnel are "off-duty police officers." (Tr. at 74.)

Apparently, not content with an application fee and a user fee, the Park District also requires applicants to purchase liability insurance of at least one million dollars. Anyone using artificially amplified sound or having more than fifty people in attendance must get a million dollars worth of insurance. (Tr. at 78.)

Finally, the Park District requires applicants to post a security deposit as an "incentive" to clean the park when the permittee is finished. (Tr. at 79.) The security does not relate to any particular cost, rather it is "an amount that was set that would give people an incentive to clean up after themselves and put things back." (Tr. at 79.)

Notwithstanding its seemingly stringent permit scheme, the Park District sometimes allows more than fifty people to assemble, with artificial amplification of sounds, in the absence of a permit. These permitless events, though not recognized/exempted under the Ordinance, occur when there is a "spontaneous" demonstration, (Tr. at 36), or a Park District sponsored or City sponsored event. The Park District, apparently, simply determines whether to allow spontaneous events to occur "depending on what people are doing." (Tr. at 65.) For example,

> [t]here was [a spontaneous demonstration] about a month or so ago. I think people marched from three public housing sites . . . and then spilled over into Grant Park. They were like kiddy-corner from the bandshell. They had bullhorns and were making speeches. It happened to be right around noon, which was when the Grant Park Symphony was rehearsing. You know, we did nothing to stop the rally, and so we had to stop the rehearsal because . . . the musicians couldn't hear.

(Tr. at 36.) Ms. Fencik testified that the Park District waived the permit requirement, although bullhorns require a permit and "[t]hey should have had a permit for a gath-

ering of that size...." (Tr. at 53; 80.) Thus, despite the fact that "hundreds" of people showed up spontaneously, the Park District "did not do anything about it." (Tr. at 53.)

Similarly, even though Mr. MacDonald's rally had no permit for the May 10 and 11, 1997 rally, the Park District "told him" he could use a bullhorn anyway. (Tr. at 9–11; 54.) The Park District also allowed Mr. MacDonald to use other means of sound amplification, including "speakers on a stick." (Tr. at 12.) In summary, sometimes the Park District ignores its own requirements— "[w]e try to work with people"—and sometimes it does not. (Tr. at 54.) Nonetheless, to the Park District's knowledge, no one has ever been arrested for having an event in Grant Park without a permit. (Tr. at 55.)

With respect to the only written waiver provision contained in the Ordinance, the Park District waives the user fee, the security deposit, and/or the insurance requirement if the permit is sought for activity "protected" by the First Amendment *and* the applicant is unable to pay. Although the Park District "[b]roadly" interprets the Ordinance's language—"protected by the First Amendment of the United State Constitution"—Ms. Fencik could provide no specific definition of what activities are covered. Basically, the Park District knows it when they see it, and waiver of fees and costs, therefore, "depends [on] what people are asking for." (Tr. at 28–29.)

Permits may be denied for any number of reasons, including, but not limited to, an applicant's: prior "material misrepresentations" about a permitted event; violations of a prior permit; incomplete application; "material falsehoods" on the application; and prior damage to Park District property. However, the Park District does not always deny a permit, even if one or more of the enumerated bases for denial are met. The Park District had difficulty articulating how it determines whether or not to deny a permit, "it's not like a mathematical formula or something." (Tr. at 82.) Moreover, the Ordinance is silent on the issue of how long a person can be disqualified from getting another permit, based upon previous violations. The ban on speech and assembly conceivably could last a lifetime. (Tr. at 86.)

## DISCUSSION

### I. *Standing*

Before determining the Ordinance's constitutionality, the Court initially must address Mr. MacDonald's standing to raise these challenges.

■ Despite the fact that Mr. MacDonald did not apply for a permit for the August 23 and 24, 1997 rally (or for May of 1998), he has standing, as do all other interested persons, to make facial challenges to the Ordinance. A prior restraint on expression, such as a permitting scheme, may be challenged facially by anyone, without the requirement that the permit be applied for or denied first. *See Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir.1991). Mr. MacDonald does not have standing to raise any "as applied" challenges to the Ordinance, however, nor does he claim any such standing for preliminary relief herein. Nonetheless, Mr. MacDonald's experiences with the Park District's permit system does shed light on the manner in which the Park District interprets and applies the Ordinance—a factor the Court must consider. *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989).

### II. *Preliminary Injunction*

#### A. Preliminary Injunction Standard

To prevail on a motion for a preliminary injunction, the movant must initially clear a threshold requirement by showing that: (1) the case has a reasonable likelihood of success on the merits; and (2) there exists no adequate remedy at law and the movant will suffer irreparable harm if the preliminary injunction is not granted. *Mil–Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir.1996); *see also Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–14 (7th Cir.1994). If these conditions are met, the initial threshold has been cleared and the court must next: (3) balance the irreparable harm to the movant if the injunction is denied, against the harm to the non-movant if it is issued improvidently; and (4) after weighing the interests of the parties, additionally consider the public interest (*i.e.* non-parties) consequences of either a grant or denial of

the injunction. *Mil–Mar,* 75 F.3d at 1156; *see also Storck,* 14 F.3d at 314.

### B. Application

#### 1. *Likelihood of Success on the Merits*

■■] In determining the likelihood of success on the merits, the court must at least find that the petitioner's chances are "better than negligible." *Kinney v. International Union of Operating Eng'rs, Local 150,* 994 F.2d 1271, 1278 (7th Cir.1993).

The First Amendment to the United States Constitution proclaims that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble. . . ." The Fourteenth Amendment makes the First Amendment applicable to the States, *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and their political subdivisions, *Lovell v. City of Griffin, Ga.,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). "The freedom of speech which [is] secured by the First Amendment against abridgement by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgement by a state." *Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 740, 84 L.Ed. 1093 (1940).

It is against this backdrop, that Mr. MacDonald's likelihood of success on the merits, for each particular challenge to the Ordinance, is examined. The Court finds that he has a strong likelihood of success, because the Park District's permitting scheme is a prior restraint and is riddled with opportunities for subjectivity and abuse.

#### a. *Prior Restraint*

The Supreme Court has "long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988) (citing *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737–38, 13 L.Ed.2d 649 (1965); *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741–42, 84 L.Ed. 1093 (1940);

*Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969)). "[T]his long line of precedent [is based upon] the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Plain Dealer,* 486 U.S. at 757, 108 S.Ct. at 2144.

■■■] The determination of whether the Ordinance is unconstitutional under prior restraint analysis depends on the resolution of two issues: whether the Ordinance is a prior restraint, and whether the Park District has too much discretion over the issuance of permits. Prior restraints exist "when a regulation '[gives] public officials the power to deny use of a forum in advance of actual expression.'" *Stokes,* 930 F.2d at 1168 (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975)). Prior restraints forbid expression before it takes place, in contrast to a subsequent punishment for expression after it occurs. It is clear that the Park District's Ordinance is a prior restraint, because under § C(5)(e), the Park District may deny use of traditional public fora in advance of actual expression or assembly.

■■■ Although prior restraints are not per se unconstitutional, they bear a "heavy presumption" of unconstitutionality/invalidity. *Bantam Books Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *see also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976) ("prior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights."); *New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971). Prior restraints are "[s]trongly disfavored as a means of speech regulation . . . ." and are "presumed invalid." *Stokes,* 930 F.2d at 1168–69. The presumption against prior restraints is based upon a theory that a free society prefers to punish the few who abuse rights of speech *after* they break the law rather than to stifle all speakers beforehand. A prior restraint is not valid unless there are procedural safeguards

reducing the danger of suppressing protected speech. *Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. at 1247. One of the most significant procedural safeguards is the requirement that a prior restraint on speech cannot be imposed based on the wholly subjective determination of a government official.

Hence, even where subjective discretion and power of a prior restraint has never been actually abused, their mere existence requires an opportunity to bring a facial challenge. *Plain Dealer,* 486 U.S. at 757–59, 108 S.Ct. at 2144–45 ("a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers."). This opportunity to bring a challenge is necessary to alleviate the risk that parties will be intimidated into self censorship. *Id.* It is also necessary because there are so many problems inherent in an attempt to make an "as applied" challenge with respect to a standardless decision that limits expression: it is nearly impossible to prove that the restriction on expression was unconstitutionally motivated. *Plain Dealer,* 486 U.S. at 758, 108 S.Ct. at 2144 ("difficult to distinguish ... between a ... legitimate denial ... and [an] illegitimate abuse of censorial power.").

"[T]he Constitution requires that the [Park District] establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." [8] *Id.* at 760, 108 S.Ct. at 2146. A regulation that may be arbitrarily applied has the potential to improperly suppress disfavored speech or disliked speakers. *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 2401–02, 120 L.Ed.2d 101 (1992). Here, those regula-

tions that the Court deems to give the Park District substantial power (whether or not exercised) to censor based on the content or viewpoint of speech, are evaluated under prior restraint analysis.

There are three primary sources of discretion in the Ordinance: (i) discretion to deny permit applications; (ii) discretion as to the fees and expenses imposed on permittees; and (iii) discretion as to the time taken to process an application. Each of these sources of discretion will be discussed seriatim.

### i. *Discretion to Deny Permit Application*

■■ Mr. MacDonald's primary challenge is centered on § C(5)(e).[9] Section C(5)(e) concerns contents of notice and grounds for denial of a permit, and reads as follows:

To the extent permitted by law, the Park District **may** deny an application for permit if the applicant or the person on whose behalf the application for permit was made has on prior occasions made **material misrepresentations** regarding the nature or scope of an event or activity previously permitted or has **violated the terms of prior permits** issued to or on behalf of the applicant. The Park District **may** also deny an application for permit on any of the following grounds:

(1) the application for permit ... is not fully completed and executed;

(3) the application for permit contains a **material falsehood or misrepresentation;**

...

(5) the applicant or the person on whose behalf the application for permit was made has on prior occasions damaged Park District property and has not paid in full for such damage, or has other outstanding and unpaid debts to the Park District; ... [or]

---

8. Viewpoint discrimination is a subset of content discrimination. Content refers to a topic whereas viewpoint refers to one's opinion or position on that topic. *See R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

9. He has also raised other challenges during briefing and hearings, including: § C(3)(a)(1), the permit requirement for any public assembly, parade, picnic, or other event involving more than fifty people; § C(3)(a)(6), the permit re-

quirement for creating or emitting any "Amplified Sound"; § C(3)(a)(9), the permit requirement for selling or offering any goods or services for sale; § C(4)(b), the application fee; § C(4)(c), the indemnification and reimbursement requirement; § C(4)(d), the security deposit; § C(4)(e), the user fees; § C(4)(f), the insurance requirement; § C(5)(b), the conditional approval provision; § C(5)(c), written denial time frame and extensions; § C(6)(a), the appeal procedure; and § C(6)(c), the financial waiver requirements. Most of these are discussed, in detail, herein.

(11) the use or activity intended by the applicant is prohibited by ... the regulations of the General Superintendent....

(emphasis added.)

The Park District has available, under this subsection, at least four alternative means of exercising almost total subjective discretion. First, the Park District has discretion to determine *what* conduct constitutes a *material* misrepresentation, a *violation* of a prior permit, a *material* falsehood on an application, or damage to Park District property on a prior occasion (collectively referred to herein as "alleged misconduct"). Second, the Park District decides who was responsible for the alleged misconduct. Third, assuming that there is some basis advanced under § C(5)(e) to deny a permit, the Park District also has unfettered discretion to decide which applications to deny, and which to permit, despite alleged misconduct.[10]

There are simply no objective criteria in the Ordinance or in practice for determining the existence of alleged misconduct and its effect on permit seekers. When asked what conditions of a prior permit have to be violated before someone is disqualified from getting another permit, Ms. Fencik testified "I can't give you a—it's not like a mathematical formula or something." (Tr. at 82–83.) There is also no provision for what type of evidence is required to prove alleged misconduct, or even that any proof is necessary.[11] Further, it is not even clear *who* at the Park District is designated to make these determinations. This provision could allow any Park District employee to make a notation in a file that he/she found or somehow learned (per-

haps from hearsay), that a person who obtained a permit and held a rally violated some provision of the Ordinance.

Additionally, there is no provision for notifying an individual, who engaged in alleged misconduct, that the Park District has made such a determination. Almost any prior permittee could be alleged (rightly or wrongly) to have "damaged" park property, if only by trampling the grass. The only way for that person to find out about the Park District's determination is when he/she (next)[12] applies for a permit. There is no opportunity or procedure in place for such an individual to challenge the Park District's determination— at least not until after a permit is applied for, and then denied, based upon those reasons.

More troubling still, there is no limit on how long an instance of alleged misconduct can cause an individual to be barred from obtaining a permit. The Ordinance provides no maximum penalty time; there is absolutely no cut-off point or end in sight.[13] Thus, the Park District could choose to exercise practically unbridled discretion to prevent someone from ever, in his/her lifetime, getting a permit (again). This subjective determination is even more invidious due to the fact that permit seekers whose *audiences* have caused prior permit violations (and therefore alleged misconduct vis a vis the permittee) are likely those whose speech generates the most public outcry. Such subjective stifling of any person's speech cannot be permitted under the First Amendment, for any reason, least of all because the permit seeker has in the past caused minor civil

10. The subpart regarding a "complete" permit, and the one specifying denial for activities prohibited by regulations of the General Superintendent, also are subject to unguided discretion.

11. An honest error in completing an application could be a material misrepresentation in the eyes of the Park District. An incorrect projection about crowd size could also be one. If an application predicted hundreds of attendees, but thousands showed up, this too could count as a material misrepresentation.

12. The Park District could also state alleged misconduct as a reason for turning down a *first* time permit applicant, if, for example, the applicant was alleged to have spray painted graffiti on Park District property.

13. In fact, this may give Mr. MacDonald standing to raise a limited "as applied" challenge to § C(5)(e)—to the extent that he is able to prove that an application thereunder would be futile due to alleged misconduct. Ms. Fencik admitted that she "[couldn't] say what would happen" if Mr. MacDonald applied for a permit in a year or two. (Tr. at 87.) In fact, there is nothing in the Ordinance indicating whether Mr. MacDonald could be banned for a lifetime. (Tr. at 86.) The issue of futility, as a predicate to an "as applied" challenge, was not briefed by the parties, however. Moreover, in light of the Court's decision under the facial challenge analysis, such potential standing need not be addressed.

unrest. In fact, that is exactly what the First Amendment seeks to prevent.

Finally, the Park District ignores the Ordinance for certain people in certain situations. Thus, its inconsistent implementation of the Ordinance creates unfettered discretion to permit or deny activity in public fora. The mayor of Chicago need not apply for a permit in order to use Butler Field, neither does the Grant Park Symphony Orchestra and Chorus. (Tr. 68–71.) The Park District also sometimes chooses to ignore the Ordinance, in response to certain spontaneous protests, as well as for particular groups that want to use the park. (Tr. at 51–54; 91.)

### ii. *Discretion as to Permit Fees, Costs, and Other Requirements*

The imposition of fees and costs provides the Park District with yet another tool to deny the right to speak freely and assemble peaceably in city parks.

In *Forsyth*, 505 U.S. at 123, 112 S.Ct. at 2397–98, the Supreme Court held unconstitutional a regulation that empowered a government administrator to vary the permit fee for assemblies and parades based upon the estimated cost of police protection. *Forsyth* involved a facial challenge to a discretionary fee, which potentially ranged from zero to one thousand dollars. The regulation allowed fee adjustment based upon the estimated cost of maintaining public order, including police protection, as well as for administrative expenses. The fee was determined based on the administrator's estimate of such costs.

The Supreme Court held that the regulation violated the First Amendment because it improperly vested unbridled discretion with the government administrator to set the fee, and because one of the factors applied—the cost of police protection—meant that the more unpopular the message (and hostile the crowd), the more the messenger had to pay. This burden on unpopular speech, based upon the listeners' reactions, was found unconstitutional. More so because it lacked adequate procedural safeguards. *Forsyth*, 505 U.S. at 137, 112 S.Ct. at 2405.

Thus, the Park District's fees and costs are examined against the *Forsyth* mandate that costs imposed in connection with a permit scheme must be standardized and non-discretionary, must bear a relationship to the administrative cost, must have adequate procedural safeguards, and must not be tied to the content of the speech or the anticipated reaction of the crowd. The Park District's fee scheme clearly cannot meet these criteria.

Section C(4)(b) states that "no application for permit shall be considered unless the applicant shall have paid at the time for filing an application for permit the required application fee in an amount in accordance with the schedule of fees...." As discussed earlier, the schedule of permit fees is divided into different classes of events, with varying application fees, user fees, security deposit amounts, and insurance requirements. *See, supra,* Findings of Fact, Part II, Permit Scheme, at 1130. Yet, there was no evidence presented by the Park District as to how it determines which event category to "put" which event under. Nowhere in the schedule of fees is there an explanation of the criteria used to classify an event as a picnic versus a festival. Apparently, the Park District just knows it when it sees it. Thus, there appears to be substantial discretion by the Park District to determine what type of permit an applicant must seek and how much the permit seeker must pay. For example, a person who wishes to address more than fifty people in Butler Field concerning a political issue could be placed in the picnic/wedding category—and charged a $10 application fee or could be placed in the festival category and charged a $105 application fee. This discretion, allowing the Park District to classify events in whatever manner it sees fit, i.e. depending upon what fees it wants the applicant to pay, enables the Park District to have discretion to set fees just as in *Forsyth.*[14]

The application fee, according to testimony elicited during the hearing, is supposed to cover the administrative costs of processing

---

**14.** Additionally, there is no provision for waiver of the application fee for people who cannot afford to pay it. Also troubling is the provision that all fees "for non-Chicago residents will be doubled." (Def.'s Ex. 4.)

the event. However, there is no evidence that the application fees actually cover the costs of processing the application and issuing the license. Thus, the Park District has failed to offer a reasonable and objective justification for the application fees.

Section C(4)(c) states that no permit shall be granted unless the applicant has:

"executed an agreement with the Park District ... in which the applicant shall promise and covenant to bear all costs of **policing**, cleaning up and restoring the park upon conclusion of the event or activity; to **reimburse** the Park District for any such costs incurred by the Park District; and to **indemnify** the Park District and hold the Park District harmless from any liability to any person resulting from any damage or injury occurring in connection with the permitted event proximately caused by the action of the permittee, the sponsoring organizer, its Officers, Employees or agents or any person under their control insofar as permitted by law.

(emphasis added.)

This provision improperly conditions the issuance of a permit on the ability of the applicant to pay for injuries and damage resulting from speech and assembly. The indemnification and reimbursement expenses depend upon the crowd's reaction to the speech and assembly. Thus, by requiring the permit applicant to personally bear the cost of his/her public rally, the conveyance of unpopular messages is chilled. This provision dissuades speakers from using public parks for political speeches because of a fear of huge financial consequences. This regulation can be used to punish a speaker for attracting too many followers—a large crowd might result in a speaker being held responsible for trampling of grass and could result in charges for resodding the park. Contrastingly, an unpopular speaker may be assessed the costs of cleaning up broken bottles thrown at him by the angry crowd. Moreover, the Ordinance also requires the applicant to guarantee in advance that, if the crowd is hostile to his/her message and resultingly requires a large security contingent,

he/she will pay for that "policing".[15] That requirement contravenes Forsyth's holding that the cost of maintaining order cannot be passed on to those wishing to demonstrate in a public forum as a pre-condition of the granting of a permit.

■ Section C(4) (d), concerns security deposits and states:

no application for permit shall be granted unless the applicant has paid, within the time prescribed by the General Superintendent, the security deposit in an amount in accordance with the schedule of fees.... The amount of the security deposit set in the schedule of fees shall be equal to the estimated cost of policing, cleaning up, and restoring the park upon the conclusion of the use or activity.... Promptly after the conclusion of a permit activity, the Park District shall inspect the premises and equipment used by the permittee....

(2) If it is determined by such inspection, that the permitted event proximately caused damage to Park District property in excess of normal wear and tear ... or it is determined that fines should be assessed against the permittee pursuant to this chapter, ... the Park District shall retain the security deposit or any portion, thereof, necessary to pay for the cost repair or any fines assessed against the permittee....

Again, similar to § C(4)(b), there are concerns about the differing categorizations and amounts. Also, like § C(4)(c) the costs imposed here go, in part, towards "policing" the event. Additionally, this provision is invalid because the Park District cannot, and does not, determine whether the debris or graffiti being cleaned up is from the speaker or, rather, from an unruly crowd, not under the permittee's control. Even worse, the Park District's schedule of fees provides that "[s]ecurity deposits triple for organizations which have forfeited their security deposits at prior events." (Def.'s Ex. 4.) This trebling of the security deposit is yet another penalty im-

---

**15.** Ms. Fencik's testimony that "policing" actually means "monitoring," and that this "monitoring" is carried out by a "security force" comprised of "off-duty police officers", does not alleviate the Court's concern that the permit fees and costs impermissibly relate to maintaining public order and police presence. (Tr. at 21; 26–27; 74.)

posed for the crowd's reaction to a previous message. As the Supreme Court explained in *Forsyth*, a regulation was invalid because "[t]hose wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit." *Forsyth*, 505 U.S. at 134, 112 S.Ct. at 2403. "Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Id.* Nor can an applicant's future speech be barred because prior speech has offended such a mob.

■ Section C(4)(e) states that "[n]o application for permit shall be granted unless the applicant has paid ... a user fee...." Again, similar to those provisions discussed above, the amounts per category, on the schedule of fees, for user fees differ and the categorization of events is subjective. This unfettered discretion to categorize an event, combined with the extreme variations of user fees, as specified on the schedule of fees, strongly indicates that the Park District is attempting to impose a tax or raise revenues, rather than merely recover its administrative expenses for paperwork. Inexplicably, the Park District does not charge different application fees for the three different tiers under the corporate festival category—despite the fact that the security deposit, user fees, and amounts of insurance differ immensely.[16] (Def.'s Ex. 4; Pl.'s Supp. Mem. at Ex. A.) This inconsistency raises serious concerns; if the user fees corresponded to costs, why are the application fees for all three types of corporate events the same? If these differing amounts are merely supposed to correspond to the number of people expected to show up, then the Ordinance and fee schedule should reflect this. However, the only category on the schedule with any reference to number of attendees is the group picnic/wedding—where the user fee and security deposit is calculated per 250 people expected to attend.

■ Section C(4)(f) imposes a hefty insurance requirement on applicants:

Applicant shall procure and maintain at all times during its use of Park District property, insurance in such amounts and with such coverages as shall reasonably be required by the Park District.... The Division of Risk Management shall prepare a uniform schedule of insurance guidelines for particular types of activities. Applicant shall provide Park District with a certificate from an insurer evidencing such coverage prior to applicant's use of Park District Property....

Although the insurance requirement is waivable in some discretionary cases, there is no provision for waiver if the applicant is unable to obtain insurance because no company will provide it. This provision merely allows the Park District to pass along its discretion to the insurance companies; the insurance providers decide whether an event is too risky to insure, and may (and likely will) make their determination based on the message/content of the event. Clearly, those with unpopular views (especially those likely to receive a negative response from the public)—for example, Nazis or the Ku Klux Klan—will have a more difficult (if not impossible) time getting insurance, or it will cost them much more.[17] *See Collin v. Smith*, 447 F.Supp. 676, 684 (N.D.Ill.1978) (insurance was beyond the reach of Nazi organization because "insurance companies are simply not interested in writing the kind of policy required due to the unknown risks involved ....") *aff'd*, 578 F.2d 1197 (7th Cir.1978), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978); *see also Pritchard v. Mackie*, 811 F.Supp. 665, 668 (S.D.Fla.1993) (insurance requirement "fails to take into account the possibility that the most heinous political groups in American society may find it difficult, if not impossible to actually purchase insurance."). Moreover, the Park District also exercises unbridled discretion by choosing to "help" certain applicants obtain insurance. (Stipulation of Facts at paras. 6, 8, 10, 12.) The Park District is not required to assist an applicant in obtaining insurance, but it sometimes chooses to help, itself an indication that insurance is sometimes difficult to obtain.

---

**16.** Some of these fees are extraordinarily high. For example, for a one day "festival" with more than one stage, the user fee, alone, runs $8,400!

**17.** Mr. MacDonald would have to spend approximately $4,000 per day for insurance. (Pl.'s Supp. Mem. at 10 n. 15.)

Finally, § C(6)(c) provides for waiver, but such waiver is totally discretionary:

Any requirement for a user fee, security deposit, or certificate of insurance shall be waived by the General Counsel, if the activity is **protected by the First Amendment** of the United States Constitution **and the requirement would be so financially burdensome that it would preclude the applicant from using Park District property for the proposed activity** ...

(emphasis added.)

Thus, if the Park District's General Counsel, Ms. Fencik, determines that an activity is "protected" and that the user fee, security deposit, or certificate of insurance is financially overburdensome, then those requirements are waived. The Park District conceded that there is "necessarily some discretion required" in making the determinations here. (Def.'s Mem. Opp. at 13.) There is no definition of what are "protected" activities. Presumably, all speech and assembly are protected by the First Amendment, but such a reading of the Ordinance would render the "protected by the First Amendment" language superfluous. The Park District could not say at trial what that portion of the waiver provision means. (Tr. at 28.)

"Freedom of speech ... [is] available to all, not merely to those who can pay their own way." *Murdock v. Pennsylvania,* 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943). The Park District cannot generate profits/revenues by taxing the exercise of First Amendment Rights. "A state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock,* 319 U.S. at 113, 63 S.Ct. at 875. This is doubly true when the fees imposed are discretionary, based on "what [permittees] are asking for." (Tr. at 28–29.)

### iii. *Discretion as to Time for Issuance, and Delay*

Section C(5)(b) states that all conditions precedent to the issuance of a permit must be met at least thirty days prior to an event:

Applications for permits for activities or events which require insurance, approval or permits from other governmental enti-

ties, or compliance with other terms or conditions, will be reviewed and, if the application otherwise conforms to all other requirements, a conditional approval will be issued. If within the time prescribed by the General Superintendent, any required fee or security deposit is not paid, or an insurance certificate evidencing the requisite insurance is not filed ... or the approval or permit of other governmental entities has not been received, or the other terms and conditions have not been met, the conditional approval will automatically expire, the application for permit will be deemed denied and no written notice of denial will be required. For events ... which involve the use of special facilities ... all terms and conditions of the permit ... must be completed **at least thirty days** prior to the event unless a **longer** time period is prescribed by the General Superintendent.

(emphasis added.)

Section C(5)(c) provides the Park District with a period of up to twenty-eight days within which to grant or deny a permit:

If no written denial or conditional approval is issued within fourteen days of the date on which a permit application is fully completed, executed and filed with the appropriate Officer or Employee ... the application shall be deemed to have been granted a conditional approval.... Provided, however, **the Park District may extend the period of review for an additional fourteen days by issuance of a written notice of extension.** If, prior to the expiration of the extended review period, no written denial is issued, the application for permit shall be deemed to have been granted a conditional approval....

(emphasis added.)

"[T]iming is of the essence in politics .... and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth,* 394 U.S. at 163, 89 S.Ct. at 945 (Harlan, J., concurring). A one or two day delay may be intolerable when applied to political speech on a topical issue; where the element of timeliness is essential. Since an enthusiastic crowd can serve to sway the undecided, even a simple delay in getting that message out

could permanently vitiate the expressive content of a demonstration.

Here, the sixty-day advance application requirement for "festivals" set forth in the schedule of fees is intolerable. Even the thirty-day advance application requirement in the Ordinance is too long—it infringes on expressions concerning current events.[18]

■ Additionally, even if the thirty— and sixty–day periods were not excessive, the discretionary process for granting extensions of time for a determination creates an invalid prior restraint. The Ordinance provides that the Park District initially has fourteen days within which to deny or grant a permit, however, the Park District may choose to extend the period of review for an additional fourteen days. There is no requirement in the Ordinance that the Park District must give a reason for extending the period of review. Likewise, the Park District need not give notice to the applicant by any particular time. That means the Park District has up to twenty-eight days to grant or deny a permit. Although the Park District must issue written notice of the extension, there is no deadline by which the notice must be issued. Thus, this provision could be used as a delay tactic to render an application for an event moot: if the Park District mails notice of the extension on the twenty-eighth day, and the mail takes two days to arrive, the applicant who applied for an event thirty days in advance would find out about the extension and/or decision on the very day on which the event was supposed to occur.[19] (Tr. at 63–64.) If the mail took longer (or if the advance application requirement was for less than thirty days—such as for picnics and weddings per the schedule of fees), an applicant could be left waiting until after the event was supposed to have occurred to learn the status of his/her permit application.

Furthermore, the procedure for appeal of a denial, § C(6)(a)(2), gives the General Superintendent seven days within which to serve notice of his decision. Section C(6)(a) states:

(1) Any applicant who is denied a permit or denied a request for a waiver of user fee, security deposit, or certificate of insurance, or a permittee who has had all or a portion of its security deposit retained because it was assessed damages or a fine, pursuant to this ordinance may, within seven days of the service of notice of such determination, file a written appeal from such determination with the General Superintendent;

(2) The General Superintendent shall have seven days from the date on which the appeal was received in which to serve upon the applicant a notice that he/she has affirmed, modified or reversed the denial or retention of security deposit....

Thus, even if someone who applied thirty days in advance and was subject to the fourteen day extension received a notice of denial in the mail at the very last minute, the application could still be moot, since the appeal process would still have seven days to run.

This seven-day appeal provision merely adds to the Park District's arsenal of available delay tactics, and increases its ability to exercise absolute discretion over the permitting process.[20]

---

**18.** Although unclear, it appears that the Park District may have taken the exigence of current events into account when it set the time frame for a media coverage application—that permit application can be turned in only ten days in advance.

**19.** Although, according to the Park District, this should not be a problem because "applicants know how to get a hold of people." (Tr. at 89.)

**20.** Mr. MacDonald also raises a claim of lack of adequate judicial review/procedure. Both parties cite *Graff v. City of Chicago*, 9 F.3d 1309 (7th Cir.1993) (*en banc*), *cert. denied*, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 464 (1994), as supporting their contentions with respect to whether a common law writ of certiorari is a sufficient procedural safeguard for appealing the denial of a permit. The Court notes that there appears to be some disagreement in the Seventh Circuit on this issue. *See 11126 Baltimore Boulevard, Inc. v. Prince George's County, Md.*, 58 F.3d 988, 1000 n. 17 (4th Cir.1995) (discussing the *Graff* decision and determining that the majority of the Seventh Circuit did not hold that prompt judicial review requirement is satisfied when common law certiorari is available); *but see River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (1994) (dicta recognizing *Graff* as holding that "the opportunity to apply for [the common law writ of certiorari] is enough ... even when rights under the first amendment are at stake."). However, since this Court has already determined that the Ordinance is replete with invalid discretion, it need not address whether a common law

**1141**

#### iv. *Summary*

In summary, the Ordinance allows virtually limitless discretion in practice, both as to the issuance of permits, and the fees, costs, and other requirements (and waiver thereof) imposed on an applicant. Mr. MacDonald has a strong likelihood of success on the merits of his prior restraint challenges.

#### b. *Time, Place, and Manner*

█ Although a municipality may not discriminate in the regulation of expression on the basis of content, it may constitutionally impose reasonable time, place, and manner regulations on the use of its public fora. Genuine time, place, and manner regulations are, by definition, content neutral and are usually aimed at concerns such as reducing noise and traffic congestion. Instead of regulating what is said, they merely regulate such matters as when, where, and how loud things are said.

The existence of prior restraints and unfettered discretion are inherently inconsistent with a valid, content neutral, time, place, and manner regulation. *See Forsyth,* 505 U.S. at 130–31, 112 S.Ct. at 2401 (a regulation that "allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'") (quoting *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981)). Thus, the provisions of the Ordinance previously discussed in Part II(B)(1)(a), Prior Restraint, fail the time, place, and manner test by default.

Content neutral regulation of the time, place, and manner of speech in a traditional public forum, such as a park, is judged under the less rigorous "time, place, or manner" test. Under this test

> the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

writ of certiorari provides sufficient judicial re-

*Ward,* 491 U.S. at 791, 109 S.Ct. at 2753 (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)).

█ Section C(3)(a) states that:

"No person shall, without a permit:

(1) "conduct a public assembly, parade, picnic, or other event involving more than fifty individuals; . . .

(6) create or emit any Amplified Sound, except from a radio, recorder or other device possessed and used by an individual for his/her own enjoyment and operated in such a manner so as not to interfere with the use and enjoyment by any other person; . . . [or]

(9) sell or offer for sale any goods or services. . . .

These three provisions apply to all persons, without reference to either content or viewpoint, and are, therefore, content neutral. The significant government interest advanced is the Park District's responsibility to maintain the parks in good order, safely and attractively, and to make them available for the use and enjoyment of Chicago's citizens. (Def.'s Mem. Opp. at 7–8.) They are narrowly tailored because they are focused on allowing all users to speak and assemble. They leave ample alternative channels because other times, places, and manners of communicating the information are available. The Court finds that these sections are reasonable and constitutional. Thus, Mr. MacDonald has very little likelihood of success on the merits of his challenge to these sections.

#### 2. *No Adequate Remedy at Law, and Irreparable Harm*

For the Ordinance sections as to which the Court has found Mr. MacDonald likely to succeed on the merits of his prior restraint challenges, the preliminary injunction analysis continues.

█ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547, (1976). Furthermore, lack of an adequate remedy at

view/procedure.

law ordinarily means that money damages would not suffice. *American Medicorp, Inc. v. Continental Illinois Nat'l Bank and Trust Co.,* 475 F.Supp. 5, 7 (N.D.Ill.1977). Money is no substitute for free speech and assembly. Therefore, money damages, even if they were measurable and available, would clearly be insufficient. Mr. MacDonald has shown that denial of the preliminary injunction would cause him to suffer an irreparable injury—denial of the right to speak and assemble—for which there exists no adequate remedy at law.

### 3. Balance of Harms

The balancing of harms involves a "sliding scale" analysis wherein "the greater the movant's chance of success on the merits, the less strong a showing it must make that the balance of harms is in its favor." *Storck,* 14 F.3d at 314. The Court has already found that Mr. MacDonald's likelihood of success on the merits, as to the prior restraint challenges, is strong. Additionally, in comparing the harm to Mr. Mac-Donald, if he is denied the right to speak and assemble (denial of a fundamental right), to the harm to the Park District if he is granted the right to speak and assemble (trampled grass, garbage, and graffiti), it is clear that the balance is in Mr. MacDonald's favor.

The First Amendment has been characterized as "... the matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Cardozo, J.,), *overruled, on other grounds, by Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Speech on public issues "occupies the 'highest rung of the hierarchy of First Amendment values'...." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (quoting *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982)); *see also Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980). Furthermore, traditional public fora, such as parks and streets, " 'have immemorially been held in

trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983) (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)).

Denying Mr. MacDonald access to Butler Field, which is a traditional public forum where citizens address public concerns, and denying him his fundamental rights to expression and assembly there, is a harm of great magnitude. The freedom to put forth one's opinions and concerns in the marketplace of ideas is one of the most significant rights this country's citizens possess. Furthermore, Mr. MacDonald relies on rallies and demonstrations to publicize his cause. Contrastingly, the Park District, if Mr. Mac-Donald is given access and portions of the Ordinance are enjoined, will merely have to deal with administrative headaches and cleanup costs. Moreover, the Park District is free to adopt new regulations consistent with the First Amendment. Thus, in balancing the harms, it is clear that the scale tips heavily in Mr. MacDonald's favor.

### 4. Public Interest

The First Amendment "reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open'...." *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). Thus, not only does the individual have the right to speak, the public has the right to listen.[21] *See Bose Corp. v. Consumer's Union,* 466 U.S. 485, 503–04, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984) ("freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole."); *Garrison v. Louisiana,* 379 U.S.

---

21. The fundamental right to peaceably assemble is also implicated. "People assemble in public places not only to speak or to take action, but also to listen, observe, and learn...." *Rich-mond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 578, 100 S.Ct. 2814, 2828, 65 L.Ed.2d 973 (1980).

64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)("speech concerning public affairs is more than self-expression; it is the essence of self-government."); *Citizen Publ'g Co. v. United States,* 394 U.S. 131, 139, 89 S.Ct. 927, 931, 22 L.Ed.2d 148 (1969). *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth . . . ."), *overruled, in part, by Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

Speech on matters of public concern— "core" First Amendment speech—has been deemed essential to a democratic society. The First Amendment is based on the theory that the broadest possible dissemination of information, from diverse and often antagonistic sources, is essential to the public welfare and decision making process. It is undeniable that the "public has an interest in encouraging the free flow of information and ideas" and in "the vindications of an individual's constitutional rights." *O'Brien v. Town of Caledonia,* 748 F.2d 403, 408 (7th Cir. 1984). Therefore, granting the injunction will not disserve, but rather will promote, the public interest, since the public interest is clearly served by strong and vigorous protection of the First Amendment. Thus, the public interest in the outcome of this matter weighs in favor of granting the injunction.

#### C. Bond Requirement

■ Pursuant to Federal Rule of Civil Procedure 65(c), a bond must be posted as a condition of a preliminary injunction. Mr. MacDonald has limited financial resources, and his organization is an unincorporated association with no assets. The Court foresees no damage to the Park District, other than ordinary wear and tear on the parks and moderate administrative burdens, in the event that the Court has erred in granting the injunction. Under the circumstances, this Court finds that a nominal bond, in the amount of $100, is appropriate.

22. The Court notes that, when so many provisions of a permit scheme are found to be invalid, severance may be improper. *See Ragsdale v. Turnock,* 841 F.2d 1358, 1375 (7th Cir.1988); *Zbaraz v. Hartigan,* 763 F.2d 1532, 1545 (7th

#### CONCLUSION

Having determined that Mr. MacDonald is entitled to a preliminary injunction, the Court must determine the scope and form of the injunction. The Court is mindful of the need to avoid scheduling conflicts, and to provide permits for large groups, amplified sounds, and sellers of goods. Although the Court has found most of the provisions in Section C of the Ordinance to be invalid, some of the provisions could survive in an ordinance drafted without discretion to deny permits on subjective grounds.[22] Therefore, the Court preliminarily enjoins the Park District from enforcing the following Ordinance provisions: § C(4)(b); § C(4)(c); § C (4)(d); § C (4)(e); § C (4)(f); § C (5)(b); § C (5)(c); § C (5)(e); and § C(6)(c). However, the Park District may continue to deny permits due to scheduling conflicts. Notice of approval or denial shall be given promptly. It is the Court's intent, by enjoining the foregoing provisions, that Mr. MacDonald may apply for and receive a permit for his festival/rally on the next available, or mutually agreeable, dates. The petition is denied as to the request for mandatory injunctive relief, which is not ripe in this facial challenge.

Accordingly, Plaintiff's Second Application for Preliminary Injunction is, hereby, **GRANTED IN PART**, and **DENIED IN PART**, consistent with this Court's attached Preliminary Injunction Order.

#### *PRELIMINARY INJUNCTION ORDER*

I. The Park District, its agents, officers, servants, employees, independent contractors, and any others in active concert or participation with anyone receiving actual notice of this Order, are enjoined from applying or enforcing, § C(4)(b); § C(4)(c); § C(4)(d); § C(4)(e); § C(4)(f); § C(5)(b); § C(5)(c); § C(5)(e); and § C(6)(c) of the Park District's Ordinance, Chapter VII, entitled "Use of Parks", pending final decision in this case.

II. Mr. MacDonald shall post a nominal bond in the amount of one hundred dollars

Cir.1985). Nonetheless, this Court deems a preliminary injunction determination an inappropriate time to address the severability issue, and has, therefore, fashioned its Order accordingly.

($100), with the Clerk of the Court, to secure the payment of such costs and damages as may be suffered or sustained by any party who may be wrongfully restrained by this Preliminary Injunction Order.

III. This Preliminary Injunction Order shall not be construed by any party to enjoin the Park District from enforcing any other lawful ordinances, including safety ordinances.

IV. The parties shall promptly meet to determine a mutually agreeable time and place for Mr. MacDonald to conduct his rally/festival.