Robert MacDONALD, Plaintiff–Appellee,

v.

CHICAGO PARK DISTRICT,
Defendant–Appellant.

Nos. 97–3106, 97–3162.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 9, 1997.

Decided Dec. 12, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied Jan. 14, 1998.

Wayne B. Giampietro, Gregory N. Freerksen, Michael John Merrick, Witwer, Burlage, Poltrock & Giampietro, Chicago, IL, Richard L. Wilson (argued), Orlando, FL, for Robert MacDonald in Docket No. 97–3106.

Steven A. Weiss (argued), Schopf & Weiss, Chicago, IL, for Chicago Park District in Docket No. 97–3106.

Wayne B. Giampietro, Michael John Merrick, Witwer, Burlage, Poltrock & Giampietro, Chicago, IL, Richard L. Wilson (argued), Orlando, FL, for Robert MacDonald in Docket No. 97–3162.

Steven A. Weiss (argued), Kevin T. Kerns, Schopf & Weiss, Chicago, IL, for Chicago Park District, in Docket No. 97–3162.

Before CUMMINGS, KANNE, and ROVNER, Circuit Judges.

PER CURIAM.

The Chicago Park District appeals from a preliminary injunction entered by the district court on August 15, 1997. After Robert MacDonald advanced a facial challenge to those provisions of the Park District Code that require a permit for certain types of events in Chicago's parks, the district court preliminarily enjoined the Park District from applying or enforcing portions of its Code. Among the provisions enjoined are those regulating the denial of permit applications and those requiring applicant-users to submit ap-plication fees, user fees, security deposits, and proof of insurance. The district court found that a facial challenge to the Code is appropriate in these circumstances because the provisions at issue amount to a prior restraint on speech, and because they accord Park District officials virtually unfettered discretion in deciding to grant or deny a permit and in setting the amount of fees. *See MacDonald v. Chicago Park Dist.*, 976 F.Supp. 1125 (N.D.Ill.1997). The injunction's effect is to prevent the Park District from denying permit applications on designated grounds until MacDonald's suit is resolved, and from requiring fees, a security deposit, and liability insurance from applicant-users. The Park District tells us that as a result of the injunction, it will lose thousands of dollars in fees that cannot be recouped should it ultimately prevail, and that it also will lose the ability in the interim to regulate the use of Chicago's parks for the benefit of all. On the Park District's motion, we stayed enforcement of the preliminary injunction and expedited consideration of the Park District's appeal. For the reasons set forth below, we find that the district court abused its discretion in entering such a broad proscriptive order. As a result, we now vacate the injunction.

## I.

Although MacDonald makes a facial challenge to the Park District Code, his interest in doing so relates to his desire to. hold further rallies in Grant Park (particularly in Butler Field adjacent to the Petrillo Bandshell) in order to advocate drug policy reform, including the legalization of marijuana. MacDonald's proposed rallies would include approximately 10,000 attendees per day, live music, vendors, tents, and amplified sound. MacDonald staged two such rallies in August 1996 after obtaining permits from the Park District.[1] Yet when he applied for a further permit to hold a similar rally in May of the following year, the Park District denied his application, citing various violations of the two earlier permits. The Park District Code

---

1. The Park District's permit requirement applies to, among other things, any public assembly or other event that involves more than fifty persons, that uses amplified sound, that includes a musi-cal performance, or that involves the erection of any tent, stage, or other structure on Park District property. *See* Park District Code § C(3)(a).

authorizes the denial of a permit if the applicant "has violated the terms of prior permits issued to or on behalf of the applicant." Park District Code § C(5)(e). Although the Park District denied MacDonald's permit application and the district court refused his request for a preliminary injunction addressed to that denial, the Park District permitted MacDonald to hold his rally on May 10–11, 1997. The Park District also assisted MacDonald by opening bathrooms, providing garbage cans, and allowing MacDonald to use portable speakers to amplify sound.

The preliminary injunction at issue in this appeal relates to MacDonald's desire to hold a similar rally in August 1997, and again in May 1998. Fearing that the Park District would deny permit applications based on the earlier violations, MacDonald did not request permits for those rallies. He instead advanced a facial challenge to the Park District's permit procedure, arguing that portions of the Park District Code are facially invalid because they violate the First Amendment. In granting MacDonald's renewed request for a preliminary injunction based on that claim, the court ordered the Park District to allow the August rally, and MacDonald staged that rally in Grant Park on August 23–24, 1997.[2]

## II.

■ Four factors are relevant to whether a preliminary injunction should issue: (1) the plaintiff's likelihood of prevailing on the merits of his claim; (2) whether the plaintiff would suffer irreparable harm absent an injunction in that he would have an inadequate remedy at law; (3) the harm to the defendant if the injunction were granted as balanced against the harm to the plaintiff if it were not; and (4) the public interest, or the effect that granting or denying the injunction would have on third parties. *Meridian Mutu-*

al *Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114–15 (7th Cir.1997); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994). Before the final two factors come into play, the plaintiff must establish a likelihood of success and irreparable harm. *Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1291 (7th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997). Yet once the plaintiff has done so, the court must balance the harm to the defendant if the injunction issues against the harm to the plaintiff if it does not, and must also consider where the public's interest lies. Even if the suit may look to have some merit, an injunction should not necessarily issue if the harm that it would work to the defendant substantially outweighs the harm to the plaintiff without the injunction. *See Ayres v. City of Chicago*, 125 F.3d 1010, 1012 (7th Cir.1997) ("The balance between the harm to the plaintiff if injunctive relief is denied and the harm to the defendant if it is granted is a critical consideration in deciding whether to grant a preliminary injunction."); *see also Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir.1994); *American Hosp. Supply Corp. v. Hospital Prod. Ltd.*, 780 F.2d 589, 593 (7th Cir.1986). When the balance of harms tips so strongly in the defendant's favor, a stronger showing of likely success is required. *McKenzie v. City of Chicago*, 118 F.3d 552, 557 (7th Cir.1997); *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir.1994).

■ We review the district court's weighing of the relevant factors for an abuse of discretion (*Meridian Mutual Ins.*, 128 F.3d 1111, 1114–15; *Ayres*, 125 F.3d at 1013), but the lower court would necessarily abuse its discretion by making an error of law. *Koon v. United States*, 518 U.S. 81, ——, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996); *Vencor*, 33 F.3d at 844. We emphasize, moreover, that the decision to grant or to

---

2. The district court entered its preliminary injunction on August 15, 1997, and that injunction prohibited the Park District from applying or enforcing section C(5)(e) of the Code in its entirety. (R. 37.) The original injunction therefore effectively prohibited the Park District from denying any permit application. The Park District filed an appeal from that injunction and, at the same time, asked the district court for reconsid-

eration. The district court thereafter modified the injunction so that it would apply only to "First Amendment activities." The court also authorized the Park District to deny permit applications on certain enumerated grounds. (*See* R. 46; *see also infra*, at 10.) The Park District filed a second notice of appeal addressed to the modified injunction.

deny a preliminary injunction "is not a decision on the merits of the plaintiff's suit." *Ayres,* 125 F.3d at 1013.

■ Rather than first assessing the likely merit of MacDonald's various claims, as is our usual practice when reviewing a preliminary injunction, we shall begin with the relative harms to the parties. *See McKenzie,* 118 F.3d at 555–56. The district court was no doubt correct in recognizing that the loss of the First Amendment right to speak and associate, even for a short period of time, will necessarily give rise to an irreparable injury. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). To the extent, then, that MacDonald's First Amendment rights would be compromised by the enforcement of the Code's permit provisions, an award of money damages would not fully compensate him for that injury.

But that leads us to ask whether MacDonald's First Amendment rights have been compromised or whether they are likely to be compromised during the pendency of this case? We are not so sure, because despite its earlier denial of MacDonald's permit application, the Park District has never prevented MacDonald from staging a rally on its property. After the district court denied MacDonald's request for a preliminary injunction addressed to the May 1997 rally, the Park District allowed the rally to go forward and even assisted MacDonald in a variety of ways. The Park District's willingness to allow MacDonald to conduct that rally without a permit is consistent with its practice of allowing "spontaneous" First Amendment rallies and demonstrations to go forward despite the failure of the event's organizers to obtain a Park District permit. Indeed, there is nothing in the record to indicate that the Park District has ever intervened to stop a First Amendment rally in one of its parks due to the absence of a permit. The Park

District's counsel told us at oral argument that once his client becomes aware of an unauthorized event, the most that it will do is to monitor the event for potential safety concerns and attempt to move the event to another location if necessary to prevent interference with other scheduled events. Thus, regardless of the validity or invalidity of the Park District's permit procedure, there is no indication that the procedure has ever resulted in the suppression of protected speech.[3] In this case, moreover, because MacDonald was allowed to hold his August 1997 rally, it seems to us very unlikely that any of MacDonald's First Amendment rights will be infringed prior to the final resolution of his facial challenge. And to the extent that any harm may become imminent (*e.g.,* if the Park District should deny MacDonald a permit for his May 1998 rally and attempt to prevent that rally from occurring), he could apply to the district court for more limited relief addressed to that particular harm. At present, however, any harm to MacDonald appears to be minimal and seems to us insufficient to justify a broad injunction against the general application and enforcement of the challenged sections of the Code.[4]

Against what we perceive to be the limited harm to MacDonald from the denial of a preliminary injunction, we must balance the harm to the Park District that will result from the injunction entered below. The district court found that the only harm to the Park District would be "administrative headaches," cleanup costs, and "ordinary wear and tear on the parks." (R. 36 at 44 & 47.) The court therefore required MacDonald to post a nominal bond of $100, finding that "Mr. MacDonald has limited financial resources, and his organization is an unincorporated association with no assets." (R. 36 at 46–47.) *See* Fed.R.Civ.P. 65(c) (party granted preliminary injunction must give security in an amount deemed sufficient by the court

---

3. We do not mean to suggest that the permit procedure is itself constitutional simply because it may not be strictly enforced. Our discussion here relates solely to the harm MacDonald would incur from enforcement of the challenged sections of the Code while his lawsuit is pending.

4. It is clear, moreover, that the Park District's fee requirements would not cause MacDonald

irreparable harm. He has conceded that none of those requirements would prevent him from staging his rallies, and if MacDonald should ultimately succeed in establishing the invalidity of any of the fee provisions, his injury could be compensated through an award of money damages.

"for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."). Before this court, the Park District takes strong exception to the lower court's characterization of the harm it will endure, and we think the Park District's point is a valid one.

By characterizing the harm to the Park District as almost negligible, it appears that the district court was addressing only the harm of allowing MacDonald's August 1997 rally to go forward. But that certainly is not the only effect of the injunction the court entered, for as we said, the injunction prohibits further enforcement of the enjoined provisions as to any permit application addressed to "First Amendment activities," not simply to MacDonald's permit applications. Thus, the injunction potentially prohibits the Park District from collecting any application and user fees during the pendency of the case. The record reveals that the application fees required under the Code range from $10 to $105 per event, while user fees range from $50 to $8,400, depending on the size and type of event. We also were told at argument that the Park District receives thousands of permit applications each year. Absent the injunction, then, the Park District would take in a sizeable sum in application and user fees while MacDonald's case is litigated in the district court. If it were unable to collect those fees due to the injunction, the fees could not be recouped if the Park District were ultimately to prevail. And MacDonald would not be good for the lost fees himself because the district court required a bond of only $100 after emphasizing MacDonald's limited financial resources. The fees lost to the Park District as a result of the injunction would therefore give rise to irreparable injury. *See Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n,* 35 F.3d 1134, 1140–41 (7th Cir.1994) (lost revenues will constitute irreparable harm if the bond required under Rule 65(c) is inadequate to cover those losses).

The injunction also prohibits the Park District from requiring event organizers to provide a security deposit, to execute an indemnification and reimbursement agreement, and to procure liability insurance for their events.

The record reveals that the Park District itself has no property insurance and that it is self-insured for the first $2 million of general liability damage. It thus appears from the limited record available to us here that the Park District would be subject to the potential for uninsured claims if it is prohibited from enforcing the security deposit, indemnification, and insurance requirements. And again, any losses incurred as a result could not be recovered from MacDonald.

Finally, the injunction prohibits the Park District from applying most of section C(5)(e) of its Code, which governs the grounds for denial of a permit application. That section provides:

Notice of denial of an application for permit shall clearly set forth the grounds upon which the permit was denied and, where feasible, shall contain a proposal by the Park District for measures by which the applicant may cure any defects in the application for permit or otherwise procure a permit. Where an application for permit has been denied because a fully executed prior application for the same time and place has been received, and a permit has been or will be granted to the prior applicant authorizing uses or activities which do not reasonably permit multiple occupancy of the particular area, the Park District shall propose an alternative place, if available, for the same time, or an alternative time, if available, for the same place.

To the extent permitted by law, the Park District may deny an application for permit if the applicant or the person on whose behalf the application for permit was made has on prior occasions made material misrepresentations regarding the nature or scope of an event or activity previously permitted or has violated the terms of prior permits issued to or on behalf of the applicant. The Park District may also deny an application for permit on any of the following grounds:

(1) the application for permit, including any required attachments and submissions, is not fully completed and executed;

(2) the applicant has not tendered the required application fee with the application or has not tendered the required user fee,

indemnification agreement, insurance certificate, or security deposit within the times prescribed by the General Superintendent;

(3) the application for permit contains a material falsehood or misrepresentation;

(4) the applicant is legally incompetent to contract or to sue and be sued;

(5) the applicant or the person on whose behalf the application for permit was made has on prior occasions damaged Park District property and has not paid in full for such damage, or has other outstanding and unpaid debts to the Park District;

(6) a fully executed prior application for permit for the same time and place has been received, and a permit has been or will be granted to a prior applicant authorizing uses or activities which do not reasonably permit multiple occupancy of the particular park or part thereof;

(7) the use or activity intended by the applicant would conflict with previously planned programs organized and conducted by the Park District and previously scheduled for the same time and place;

(8) the proposed use or activity is prohibited by or inconsistent with the classifications and uses of the park or part thereof designated pursuant to this chapter, Section C.1., above;

(9) the use or activity intended by the applicant would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public;

(10) the applicant has not complied or cannot comply with applicable licensure requirements, ordinances or regulations of the Park District concerning the sale or offering for sale of any goods or services;

(11) the use or activity intended by the applicant is prohibited by law, by this Code and ordinances of the Park District, or by the regulations of the General Superintendent.

Park District Code § C(5)(e). Although the court originally enjoined the Park District from applying or enforcing this provision in its entirety, on reconsideration, the court concluded that its injunction would apply only to the Park District's handling of permit applications for "First Amendment activities," a limiting but potentially all-inclusive term. The modified injunction also authorizes the Park District to deny a permit application on the grounds enumerated in subsections (6) and (7), or because the applicant has not complied with City of Chicago licensure requirements for the sale of food, or "because the use or activity intended by the applicant is prohibited by law, or by the Park District Code (other than those portions whose enforcement is enjoined by this Order)." (R. 46.) Yet the Park District argues that even under the modified injunction, it has lost the ability to maintain Chicago's parks for the use and enjoyment of all citizens. The Park District emphasizes that although the reconsidered order gives it the power at least to manage scheduling conflicts, it still would be unable to deny a permit if the proposed activity "would present an unreasonable danger to the health or safety" of other users of the park or Park District employees, or if the proposed activity would be inconsistent with the Park District's designated classifications for uses of particular areas of the parks.[5]

We again find the Park District's point to be well-taken. No one doubts that the Park District has a significant interest in maintaining Chicago's parks "in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 296, 104 S.Ct. 3065, 3070–71, 82 L.Ed.2d 221 (1984). The district court found as much in concluding that MacDonald has little chance of establishing that the permit requirement itself is unconstitutional. (*See* R. 36 at 42.) Enjoining the Park District from denying a permit on either of the above two grounds not only would cause "administrative headaches" for the Park District, as the district court found,

---

**5.** The Park District explains that the Lincoln Park Conservatory and the Park District's swimming pools, for example, have both been designated as "limited use areas." Under the injunction, the Park District would be unable to deny a permit application for any proposed event that would be inconsistent with the designated limited uses of those facilities.

but would severely hinder the Park District in its attempt to protect the parks and those who use them. The district court's injunction therefore potentially harms the parks themselves as well as potential users, a result that cannot be squared with the public interest. In sum, in the absence of any showing that the enjoined provisions of the Code have or would preclude MacDonald from staging a First Amendment rally, we must conclude that both the balance of harms and the public interest weigh decidedly in the Park District's favor.

█ Yet that conclusion would not in all cases signify that the grant of a preliminary injunction would entail an abuse of the district court's discretion. A preliminary injunction may still be appropriate, for example, if the plaintiff is able to demonstrate a very strong likelihood that it will succeed on the merits. See Ayres, 125 F.3d at 1013; McKenzie, 118 F.3d at 557; Vencor, 33 F.3d at 845. But we are less convinced than the district court that MacDonald has made such a strong showing here.

█ The district court concluded that MacDonald's likelihood of success on his facial challenge is strong because the Park District's permit scheme accords Park District officials too much discretion in deciding to grant or deny a permit and in determining the applicable fees.[6] As the district court observed, the primary focus of MacDonald's facial challenge is section C(5)(e), which is set out above. Although the district court did not doubt that this provision on its face is content-neutral, the court found that it provides opportunities for Park District officials to make subjective determinations involving the content of proposed speech. As a result, the court found the Park District's discretion to suppress protected speech to be virtually unlimited.

We are troubled, however, that the district court reached this conclusion without addressing our en banc decision in Graff v. City of Chicago, 9 F.3d 1309 (7th Cir.1993) (en

banc), cert. denied, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 464 (1994), where we considered whether a Chicago ordinance for the licensing of newsstands accorded unfettered discretion to government officials. Under the Graff ordinance, the designated city official was to consider six exclusive criteria in determining whether to grant a license application:

"(1) Whether the design, materials and color scheme of the newspaper stand comport with and enhance the quality and character of the streetscape, including nearby development and existing land uses; (2) Whether the newspaper stand complies with this code; (3) Whether the applicant has previously operated a newspaper stand at that location; (4) The extent to which services that would be offered by the newspaper stand are already available in the area; (5) The number of daily publications proposed to be sold from the newspaper stand; and (6) The size of the stand relative to the number of days the stand will be open and operating."

Id. at 1317–18 (quoting Chicago Mun.Code § 1028–160(a)). City officials were also empowered to "remove a newsstand that 'endangers public safety or property,' that 'interferes with or impedes the flow of pedestrian or vehicular traffic,' or [that] is placed 'in such a manner as to impede or interfere with the reasonable use of [a display window].'" Id. at 1318 (quoting Chicago Mun.Code § 10–28158(a) & (b)). Nine of twelve judges on the en banc court concluded that this ordinance was sufficiently objective and specific to limit the decisionmaker's discretion and thereby to survive a facial First Amendment challenge. The court's lead opinion, speaking for five judges, observed that:

By requiring the commissioner to consider these factors, his discretion is limited, not unbridled. The criteria give adequate and specific guidance to the commissioner as well as reasons for the

6. When virtually unlimited discretion exists, the Supreme Court has said, the possibility is too great that it will be exercised in order to suppress disfavored speech. See City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757–58,

108 S.Ct. 2138, 2144–45, 100 L.Ed.2d 771 (1988). In those circumstances, then, a facial challenge to the validity of the permit scheme will lie. Id. at 755–56, 108 S.Ct. at 2142–44.

applicant to anticipate the basis for granting or denying a particular permit to build a newsstand. If a permit to build a newsstand were denied, these express standards (and the commissioner's written reasons) give the plaintiff adequate guidance in challenging the application of the ordinance to his particular case, and upon judicial review allow an informed inquiry into whether the commissioner made his decision in an unconstitutional manner, such as by disfavoring certain speech.

*Id.* (internal citation omitted); *see also id.* at 1329 (Flaum, J., concurring) (although the enumerated factors "allow a measure of flex," they are "the kinds of legitimate concerns one would expect a city to weigh when deciding how to allocate limited public space in a neutral way."); *id.* at 1335 (Ripple, J., concurring) ("In no way does the ordinance place unfettered discretion in the hands of city officials.").

The Park District argues that the criteria to be considered in granting a permit under its Code are even more specific than those in the ordinance in *Graff* and that section C(5)(e) must therefore also survive a facial challenge. We need not definitively resolve the matter today at the preliminary injunction stage, but we agree with the Park District that *Graff* poses a substantial obstacle to MacDonald's ability to establish that section C(5)(e) is facially invalid. *See also Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661 (1989) ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."); *United States v. Kistner*, 68 F.3d 218, 221 (8th Cir.1995) (no unbridled discretion in park permit regulation that required consideration of overcrowding, "peace and tranquility," public health and safety, and potential for damage to park resources and facilities). In light of *Graff*, MacDonald's likelihood of success on this issue is

not sufficiently strong to overcome the Park District's overwhelming advantage on the balance of harms. *See McKenzie*, 118 F.3d at 558.

We also must discount the likelihood that MacDonald will succeed in showing that the fee and insurance provisions of the Code are facially invalid. The district court thought it likely they are because it believed that those provisions, too, provide Park District officials virtually unbridled discretion in determining the fees for a particular event. Although the fees to be charged are ascertained by reference to a content-neutral schedule broken down according to the type of event (*i.e.*, picnics and weddings, athletic events, or corporate/festival events),[7] the district court found that Park District officials have too much discretion in assigning events to one of the designated categories and that assignment decision essentially determines the fee. The court concluded that by controlling the assignment decision, then, Park District officials have the same type of unbridled discretion to set fees under its Code that the Supreme Court condemned in *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

It appears to be undisputed, however, that the applicant, rather than the Park District, makes the relevant classification, either by applying for a particular type of permit, or by requesting amenities such as stages and tents that will serve to place the proposed event into a particular category. As the Park District points out, objective criteria are used to define the various types of events, and there is nothing in the record to indicate that there has been confusion in practice as to the category into which a particular event will fall. As a result, the Park District's fee structure does not appear to approach the arbitrary system condemned by the Court in *Forsyth*. The local government official in that case had the discretion to vary the fee charged to applicants for a parade permit based upon the estimated cost of maintaining public order, a factor that

---

7. The corporate/festival category is further divided into three levels, with the fees escalating at each level, based upon the number of stages and tents requested by the applicant. (See Def. Ex.

4.) An "athletic event," moreover, is defined on the schedule to include "[r]aces and corporate-sponsored tournaments that do not include vendors, stage, sound system or alcohol." (*Id.*)

necessarily required the official to consider the content of the applicant's message. *Forsyth*, 505 U.S. at 132–33, 112 S.Ct. at 2402–03. There does not appear to be similar discretion here, as the applicable fees are set in advance according to a content-neutral schedule. *See Center for Auto Safety, Inc. v. Athey*, 37 F.3d 139, 145 (4th Cir.1994), cert. denied, 514 U.S. 1036, 115 S.Ct. 1401, 131 L.Ed.2d 289 (1995). The only exception to the published schedule recognized by the Code relates to the opportunity for a waiver of the user fee, security deposit, and insurance requirements "if the activity [proposed by the applicant] is protected by the First Amendment of the United States Constitution and the requirement would be so financially burdensome that it would preclude the applicant from using Park District property for the proposed activity." Park District Code § C(6)(c). If that is the case, the referenced requirements "shall be waived." (*Id.*) Absent evidence that this waiver provision has been applied by the Park District in a discriminatory manner, we doubt that it vests too much discretion in local officials under *Forsyth*. For these reasons, we do not think MacDonald's chances of succeeding on this aspect of his facial challenge are sufficiently strong to support the broad injunctive relief granted below.[8]

The district court found fault with other aspects of the Park District's Code as well, but the two we have discussed were the most critical to its decision to grant injunctive relief. We need not express an opinion today on the additional issues considered by the district court because they would not alter our conclusion that that court abused its discretion by issuing such a broad injunction. We emphasize again, however, that today's decision is not one on the merits of any of

MacDonald's claims, including the two we have specifically discussed. MacDonald may well be able to establish on a more complete record that at least one or more provisions of the Park District's Code are facially invalid under the First Amendment. We merely hold that in light of the Park District's advantage on the balance of harms, MacDonald's chances of succeeding are not sufficiently strong to enjoin application of the challenged provisions of the Code. The preliminary injunction is accordingly VACATED.

---

**8.** MacDonald also argues that the fees charged under the Park District's schedule are excessive. The district court expressed some sympathy for this position but did not base its decision to grant the injunction on that ground. *See, e.g., Cox v. New Hampshire*, 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941) (fee charged in connection with license for public parade that served not as a tax, but as a means "to meet the expense incident to the administration of the [licensing] act and to the maintenance of public order in the matter licensed" is constitutionally permissible); *Center for Auto Safety*, 37 F.3d at 145 (fees

charged by state do not impermissibly burden protected speech because they "are calibrated to approximate the costs of administering" the state regulatory program, and "the revenues raised by the fees do not exceed these costs."). We express no opinion on the matter here, as the record has not been sufficiently developed for a reliable assessment to be made. In any event, absent a threat that the allegedly excessive fees are likely to suppress protected speech by the plaintiff, this contention would not support an award of preliminary injunctive relief because there would be an adequate remedy at law.