# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-3541

CHURCH OF THE AMERICAN KNIGHTS
OF THE KU KLUX KLAN,

*Plaintiff-Appellant*,

v.

CITY OF GARY, INDIANA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 01 C 62—**James T. Moody**, *Judge*.

ARGUED MAY 14, 2003—DECIDED JULY 2, 2003

Before POSNER, RIPPLE, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*.   The Church of the American Knights of the Ku Klux Klan (the parties refer to it as "CAKKKK"), which describes itself as "a Christian civil rights, white separatist group," appeals from the dismissal on grounds of mootness of its suit to enjoin the enforcement of provisions that the mayor of Gary, Indiana added by executive order to the City's "parades and processions" ordinance. The ordinance regulates parades, rallies, and other demonstrations held on the city streets or city property, plus "open-air assemblies" on ground

abutting a street. CAKKKK had applied for a permit to conduct a rally on the steps of Gary's city hall but had failed to obtain the permit because it was unable to pay the stiff permit fee required by one of the provisions that it is challenging. Anticipating that we might hold that the suit was not moot, the parties have briefed the merits as well as the issue of mootness.

CAKKKK was founded in 1995 by the Reverend Jeffery Berry, who was and remains the organization's head with the title of National Imperial Wizard. Headquartered in Butler, Indiana, the organization has branches in several states. The branches are called realms, and each is headed by a "Grand Dragon." Jean Null is the Grand Dragon of the Indiana realm. In March 2001, the month before the requirement of paying a fee was added to the parades ordinance, CAKKKK had held a rally in Gary pursuant to a permit that Null had obtained, but the police had shunted the rally off to a little-used stadium (it has since been closed) four miles from the center of the city. Dissatisfaction with that location led Null to file with the City in the same month the further application, to conduct a rally in front of the city hall of Gary, that lapsed when she was unable to pay the fee.

Despite this indication that CAKKKK would hold another rally in Gary were it not for the fee requirement that it cannot satisfy and that it contends is unconstitutional, the district judge, having learned in the course of the litigation that Berry had recently pleaded guilty to criminal confinement by means of a gun and in December 2001 had been sentenced to prison for seven years, was led to wonder whether CAKKKK would actually conduct a rally in Gary if it obtained the injunction it was seeking. In an affidavit on mootness that the judge requested, Null acknowledged that "CAKKKK has not conducted rallies in

Indiana since Rev. Berry was incarcerated because we did not want to adversely affect any possible sentencing modification" that he might seek. But she added: "However, I know that Rev. Berry feels very strongly about having a rally in Gary, Indiana. If the Court was to rule in our favor in the lawsuit, I would organize a rally in Gary at the earliest possible opportunity which the CAKKKK would conduct even if Rev. Berry was still incarcerated." She further attested that she was planning "a large rally of CAKKKK members" (in fact a two-day "National Klonvocation") in Butler in July 2002; and at argument CAKKKK's lawyer told us without contradiction that the rally was held even though Berry was (and is) still in prison. Perhaps by then the issue of a modification of his sentence had been resolved one way or the other.

The judge ruled that the "Rev. Berry feels very strongly" part of Null's affidavit was inadmissible because hearsay. The ruling was incorrect. Hearsay is an out-of-court statement sought to be used as evidence of the statement's truth. The issue of mootness is not a matter of what Berry feels, strongly or otherwise, but of what he led Null to believe would be his reaction to her holding a rally in Gary during his imprisonment, because if she believes he wants the rally held she will hold it. She is perfectly competent to testify about what she understood him to have told her. *Pugh v. City of Attica*, 259 F.3d 619, 627 and n. 7 (7th Cir. 2001); *United States v. Sanchez*, 32 F.3d 1002, 1005 (7th Cir. 1994); *United States v. Williams*, 952 F.2d 1504, 1518 (6th Cir. 1991); see also *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001). It is conceivable that she was not reporting what Berry had told her but instead was trying to read his mind, or even that she was misrepresenting what he had told her. Yet, oddly enough, if *that* is what she is doing it is an even stronger indication of her intention to hold the rally than

if he told her to go ahead. It would suggest that she was determined to hold the rally, whatever the collateral consequences for Berry. This would be consistent with the speculation in a police report in the record that Null's relationship with Berry has become strained.

CAKKKK put in enough evidence to establish a reasonable probability that if the fee is enjoined the rally will be held, and thus that CAKKKK would derive a tangible benefit from winning its case, and no more than a reasonable probability of this was required to show that the case is not moot. E.g., *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 909-10 (7th Cir. 2003). The City might have tried to rebut CAKKKK's evidence by obtaining an affidavit from Berry, but it did not do so; it presented no evidence at all relating to the question of mootness. This is not a case in which a litigant, wanting to remain in federal court, does not press a jurisdictional objection. The City wants to be out of court and so argues that the case is moot, yet has failed to back up its argument with any evidence, which suggests that there is none. We conclude that the case is not moot, and since there are no factual disputes for resolution by the district court, we proceed to the merits.

One of the two provisions relating to parades and other demonstrations that CAKKKK challenges was adopted in January 2001, after CAKKKK had, according to Null, applied for numerous permits to hold a rally in Gary. The January provision requires anyone seeking a parade permit to apply 45 days in advance of the parade. (We're using the term "parade" generically, as it is used in the ordinance, since the rally that CAKKKK wants to hold on the steps of city hall is not a "parade" in the usual sense of the word.) The other challenged provision was adopted in April of the same year in the wake of CAKKKK's rally in the stadium the previous month and

after Null had applied for a permit to hold a rally on the steps of City Hall. This provision states that if "it is reasonably determined" that the applicant for the permit "has a prior history of engaging in conduct which is unlawfully violent and has unlawfully caused or threatened to cause harm to persons or property," the City's police chief is to determine what police protection will be "reasonably necessary . . . to protect other persons and property from such harm from such Applicant." Having made this determination the chief is to "us[e] his best professional judgment" to determine "the actual cost to the City of Gary for those police officers that have been determined to be reasonably necessary to protect persons and property from harm by the Applicant"—and the applicant must pay that cost in the form of a fee before the permit can be granted. This is the only fee that Gary imposes on groups that conduct parades or hold open-air assemblies.

CAKKKK's intention to demonstrate in the heart of downtown Gary, a city 84 percent of whose 103,000 residents are black, is provocative, to say the least. The Ku Klux Klan, like the burning cross that is its most dramatic and ominous sign, is a symbol of organized violence, physical as well as verbal, directed against blacks. During its heyday in the period of Reconstruction that followed the Civil War, the Klan was an outright terrorist organization dedicated to intimidating blacks and restoring white supremacy. The Klan subsided when its goal was achieved with the end of Reconstruction, but it has had periodic reawakenings, most recently during the civil rights struggles of the 1960s. (For a recent summary of this history, see *Virginia v. Black*, 123 S. Ct. 1536, 1544-45 (2003).) Lately the Klan has fallen on evil days, splintering into more than 100 often warring groups whose aggregate membership is estimated to be a meager 5,000 to 6,000. See the Southern Poverty Law Center's database of hate groups, located at

http://www.tolerance.org/maps/hate/index.html. One of these Klan groups may have only a single member! "Klan Group Plans Rally to Support Augusta Club," *N.Y. Times*, Mar. 2, 2003, at 18. CAKKKK, however, has been among the most active of the splinters in recent years. See Dan Berry [no relation to CAKKKK's Berry], "Shrunken and Splintered Klan Is Still a Potent Lure for the Disaffected," *N.Y. Times*, Oct. 23, 1999, at B5; and another database of the Southern Poverty Law Center, located at http://www.splcenter.org/cgi-bin/goframe.pl?refname=/intelligenceproject/ip-4i7.html; and see generally Worth H. Weller, *Under the Hood: Unmasking the Modern Ku Klux Klan* (1998).

Jeffery Berry claims without contradiction to have no ties with any other Ku Klux Klan group. But the Klan fractions are as one in preaching white supremacy, homophobia, and antisemitism in the vilest terms and flaunting the Klan's familiar regalia and symbology; and the combination of their message with the connotations of violence and bigotry that cling to the name "Ku Klux Klan" and to the characteristic Klan "trade dress" (to borrow an apt term from unfair-competition law)—the white sheets, the hoods, the burning cross, the song ("The Old Rugged Cross"), the outlandish titles of officers ("Imperial Wizard," "Imperial Kludd," "Grand Dragon," "Exalted Cyclops," "Hydra," and the rest)—is incendiary and it burns with an especially white heat when a Klan organization parades in a black community. The location of the community can also stoke the fires. Indiana did not secede from the Union, but the state has a long history of racial discrimination and Klan activity—in the 1920s, the Klan was more powerful in Indiana than in any other state. Wyn Craig Wade, *The Fiery Cross: The Ku Klux Klan in America*, ch. 8 (1987). "Indiana was the success story of the 1920s Klan."

Michael Newton & Judy Ann Newton, *The Ku Klux Klan: An Encyclopedia* 286 (1991).

Because CAKKKK is tiny—its March 2001 rally in Gary drew only 27 members, and it anticipates only 50 at its City Hall rally if it is ever permitted to hold it—the concern with violence that animates the challenged ordinance provisions, although it is real, is not primarily a concern with violence by CAKKKK marchers. They are too few to be likely to attack onlookers or counterdemonstrators. The concern is that counterdemonstrators will attack them. The earlier rally in Gary drew between 150 and 200 such—more than five times as many as the ralliers—and although one of the Klan demonstrators daringly shook his fist at the counterdemonstrators, there were no acts of violence by the Klansmen and the only arrest was of one of the counterdemonstrators and it occurred after the rally ended. The Indiana State Police has advised the Gary police that the likelihood of violence by CAKKKK, should the rally on the steps of City Hall be permitted, is low. The danger of violence, the state police believe, "is associated more with the protesting groups than with the Klan itself." Klan rallies attract leftwing extremists, such as members of the Revolutionary Communist Youth Brigade and the oddly named Skinheads Against Racial Prejudice, who, in the words of the state police, "seek to provoke violent confrontations with white supremacy groups."

The City had granted CAKKKK a permit for the earlier rally at a time when the ordinance required the mayor to issue a permit so long as the parade or other demonstration was "not to be held for any unlawful purpose and will not in any manner tend to a breach of peace or unnecessarily interfere with the public use of the streets of the city or the peace and quiet of the inhab-

itants." The permit was issued in February and the rally held in March. Nothing happened between February and the assessment of the fee in April to justify an upward adjustment in the perceived likelihood that a CAKKKK rally would turn violent.

What is true is that given the possibility of violence by counterdemonstrators outraged by the message and symbols and latent menace of the Klan, even the minuscule rally that CAKKKK plans will if it is allowed to take place require a heavy police presence, at some cost to the City of Gary in police overtime unless the police thin out coverage in other parts of the City (a potentially relevant qualification, of which more later). The City's brief states that "standard requirements for a Ku Klux Klan rally include fencing and barricades that enforce separation of the Klan from other attendees, who, themselves, must be separated into separate enclosures for pro and con demonstrators and all three separated from the press, for its safety. In addition, separate parking areas must be provided and guarded, and all attendees must be screened for weapons."

But the Supreme Court held in *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949), and the holding has been repeated countless times, see, e.g., *Cox v. Louisiana*, 379 U.S. 536, 551-52 (1965); *Collin v. Smith*, 578 F.2d 1197, 1206 (7th Cir. 1978); *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1206-07 (10th Cir. 2002); see also *Reno v. American Civil Liberties Union*, 521 U.S. 844, 880 (1997), that a permit for a parade or other assembly having political overtones cannot be denied because the applicant's audience will riot. To allow denial on such a ground would be to authorize a "heckler's veto." It follows pretty directly that a city cannot in lieu of denying the permit charge the applicant for the ex-

pense to the city of reining in the hecklers. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992); *Thomas v. Chicago Park District*, 227 F.3d 921, 925 (7th Cir. 2000), aff'd on other grounds, 534 U.S. 316 (2002); *Chicago Acorn v. Metropolitan Pier & Exposition Authority*, 150 F.3d 695, 701 (7th Cir. 1998). Especially when, as in this case, the group that is seeking the permit is highly unpopular and as a result impecunious and so can be as effectively barred from speaking by the conditioning of the grant of the permit on the payment of a cost-based fee as by an outright denial of the permit.

This is true even if the fee is calculated with scrupulous precision by a battalion of cost accountants. But this fee was not and the subjectivity of its calculation is another objection to it given the Supreme Court's hostility to regulations of speech that allow broad discretion ("unbridled discretion" is the favored formula) to the regulators. E.g., *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002); *Forsyth County v. Nationalist Movement, supra*, 505 U.S. at 130; *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755-57, 770 (1988). The fee was $4,935, the cost in overtime pay of assigning 28 officers "to restrain 50 KKK members at rally." This is more than one police officer for every two Klansmen. We would have to be awfully naïve not to suspect that the 28 officers are needed, rather, to separate the Klansmen from the far more numerous hecklers who can be expected to appear, and to restrain the latter. Nor, though this is a detail, is it certain that the Gary police force, which has a total of some 300 officers, needs to pay overtime in order to assign 28 of them to stand in front of City Hall for a short time. The police force has a crowd-control squad (though we do not know its size) that unless otherwise occupied can police the rally at no marginal cost to the City, since, like other emergency workers, the members of the squad are paid

their salaries whether they are doing anything or just sitting in the stationhouse waiting to be called. But we do not put any weight on this factor, as the City's police resources, including the crowd-control squad, may be stretched taut by the need to protect, not the citizens of Gary from the Klansmen, but the Klansmen from the counter-demonstrators.

Subjectivity also attended the City's prediction that the Klansmen would commit violent acts at the rally. The mayor, rejecting the advice of the state police, claims to have based his decision to do so on his "life experiences." He believes with no stronger foundation that the Ku Klux Klan is a monolith and that the potential of the CAKKKK to engage in violence can be inferred from the entire history of Klan violence, which goes back to the Klan's formation in 1866. The Gary police were more impressed by the fact that six members of CAKKKK have arrest records. But so far as appears the only one of the six who was ever arrested for a violent act *at a rally* was Berry himself, who of course cannot attend a rally in Gary in the foreseeable future because he's in prison. There is no indication that any of the arrests of the other five resulted in a conviction.

And there is more. Suppose that 10,000 Girl Scouts wanted to parade through downtown Gary. Traffic would have to be rerouted, requiring the deployment of additional policemen along the parade route, and yet the fee for the parade would be zero. At the oral argument of the appeal, the City's lawyer acknowledged that a substantial but completely peaceable demonstration would be likely to cost the City $15,000 to $20,000, more than thrice the amount of the fee charged for a minute Klan rally. It is apparent therefore that the requirement of the fee is not based on a concern with the burden on public services

that parades and other open-air assembles impose—a concern that would be entirely legitimate and would permit the charging of a cost-based fee, *Cox v. New Hampshire*, 312 U.S. 569, 576-77 (1941); *Thomas v. Chicago Park District, supra*, 227 F.3d at 925; *MacDonald v. Chicago Park District*, 132 F.3d 355, 362-63 (7th Cir. 1997) (per curiam); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1320-24 and n. 16 (11th Cir. 2000); *Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1136-37 (6th Cir. 1991). If rather than 10,000, 100,000 Girl Scouts marched the fee would still be zero even though it would be obvious that the additional police services entailed would exceed those required to restrain 50 members of CAKKKK. The fee thus does not make a tight fit with the fiscal and other neutral concerns on which municipalities are permitted to base regulation of speech without running afoul of the First Amendment. In fact, it is obvious that the actual purpose of the fee requirement is to prevent Klan rallies in Gary, a purpose that is understandable (the police chief estimates that if a Klan rally is held in downtown Gary "there will be thousands of hostile counterdemonstrators coming from both within and outside of the City") but also unconstitutional.

Turning to the other challenged restriction, the requirement of applying for a permit 45 days in advance, we begin by noting the reasonableness in general of requiring that a permit to hold a demonstration on city streets or other public property be sought in advance of the event. A municipality needs some time to decide whether to grant the permit and if so whether to impose conditions on the grant. *Thomas v. Chicago Park District, supra*, 227 F.3d at 925-26. But the length of the required period of advance notice is critical to its reasonableness; and given that the time required to consider an application will generally be shorter the smaller the planned demonstra-

tion and that political demonstrations are often engendered by topical events, a very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech. Compare *id.* at 926; *MacDonald v. Chicago Park District, supra,* 132 F.3d at 358; *Grossman v. City of Portland,* 33 F.3d 1200, 1205-06 (9th Cir. 1994). A group that had wanted to hold a rally to protest the U.S. invasion of Iraq and had applied for a permit from the City of Gary on the first day of the war would have found that the war had ended before the demonstration was authorized. The City does have an unwritten policy of waiving the permit requirement for a "spontaneous" demonstration, but only if the demonstration is "not planned." The scope of the dispensation is thus opaque. Courts more skeptical than ours about the validity of advance-notice requirements point out that requiring even a short period of advance notice prevents spontaneous demonstrations. *Douglas v. Brownell,* 88 F.3d 1511 (8th Cir. 1996); *NAACP v. City of Richmond,* 743 F.2d 1346 (9th Cir. 1984).

Before the 45-day requirement was instituted, obviously aimed at the Klan, permits were often sought no more than two weeks before the planned event and no one complained that the period was too short to enable an adequate evaluation of the application. Evansville, Indiana, a city of approximately the same size as Gary, requires only 24 hours' notice of intent to hold an open-air assembly. While it might conceivably take 45 days for the City to process a permit for a million-man march down the main street of Gary, it should not take 45 days to process a permit for a 50-man CAKKKK rally in front of City Hall—unless perhaps the City could constitutionally make the completion of a threat assessment (which if done thoroughly could take considerable time) a predicate for a permit fee or other restriction, which we

have held that it cannot do, at least in the way in which it has done it in this case.

It is true that in *Thomas v. Chicago Park District, supra,* 227 F.3d at 925-26, we upheld a 30-day advance-notice requirement (60 days if special facilities, such as a band shell or a public-address system, were to be used) for rallies and demonstrations in Chicago parks. But we did so on the basis of evidence that the authorities were being overwhelmed by thousands of applications. That is distinctly not the case in Gary and anyway 45 is greater than 30. The use of parks for demonstrations involves, moreover, complexities not involved in street rallies, as shown by the fact that Chicago requires that permits for street rallies be sought only seven days in advance of the rally. Of course a permit need not be granted for a demonstration if the authorities reasonably believe that the demonstrators (as distinct from counterdemonstrators) will be violent. *Boos v. Barry,* 485 U.S. 312, 329-32 (1988); *Grayned v. City of Rockford,* 408 U.S. 104, 115-16 (1972); *Cox v. New Hampshire, supra,* 312 U.S. at 574; *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107, 119-20 (D.C. Cir. 1977); see also *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia,* 919 F.2d 148, 150 (D.C. Cir. 1990) (per curiam). And so the police must be allowed a reasonable time to determine the demonstrators' intentions if it suspects that there is a danger of violence. Cf. *Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1015-16 (7th Cir. 1984). But the 45-day period selected by the City of Gary and made applicable to all permit seekers whether or not any danger of violence is perceived is arbitrary; no effort to justify it has been made; and an incidental effect, but one to which CAKKKK is permitted to point by virtue of the doctrine of *Thornhill v. Alabama,* 310 U.S. 88, 97 (1940); see also *Gooding v. Wilson,* 405 U.S. 518, 520-21 (1972); *Ryan v. County of DuPage,* 45 F.3d 1090,

1095 (7th Cir. 1995), is a clear violation of the free-speech rights of obviously peaceable marchers, such as the Girl Scouts in our earlier example.

Although, as we have explained, the case law interpreting the free-speech clause of the First Amendment condemns the restrictions on parades and rallies that CAKKKK has challenged, the result is not a happy one. The rally that we reluctantly but confidently conclude CAKKKK is constitutionally entitled to hold in Gary's downtown is intended not to convert onlookers to the creed of white supremacy but to cause outrage and by doing so attract attention to the organization and possibly assist its recruiting among racists in white communities in Indiana and elsewhere. The history of the Klan and its heavy reliance on symbols laden with threat casts CAKKKK's First Amendment activities in the mold of incitement rather than persuasion. A realistic conception of "fighting words," which have long been understood not to be protected by the First Amendment, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942), might well be thought to extend to the words "Ku Klux Klan" and to the sinister and offensive symbols used by organizations that identify themselves by those words, and thus to require that the doctrine of the *Terminiello* case be narrowed. The Supreme Court's recent decision in the cross-burning case may be a step in that direction. But we are not authorized to take the further step of upholding Gary's ordinance, especially in view of the distinction drawn in the plurality opinion in that case between "a cross burning done with the purpose of creating anger or resentment and a cross burning done with the purpose of threatening or intimidating a victim," *Virginia v. Black, supra*, 123 S. Ct. at 1551, only the latter being punishable consistent with the Court's current understanding of the First Amendment.

But perhaps that understanding is ripe for reexamination. For while the First Amendment surely prevents the government from interfering with the dissemination of offensive ideas, it is less clear why it should be thought to privilege their dissemination by means that show an intent not to persuade, but instead to incite a violent reaction either from ordinarily peaceable people or from extremists at the other end of the political spectrum from the Klan. It is not as if the bad vibrations given off by the Klan were redeemed by ideas, eloquence, or a coherent articulation of sane propositions—for here are the words of Jeffery Berry at a Klan rally held in 1998 (quoted in Weller, *supra*, at 41-43):

> Only God has the right to create a race—not no black and white, not no nigger, not no Jew. Yes, I will use the word *nigger*, because it is not illegal! [[A nigger is] a dirty low-down scum who takes from society. We are sick and tired of the government taking your money, and giving food and jobs to the niggers when the white race has to go without! Wake up America . . . . God made Adam and Eve—not Adam and Steve. I am sick and tired of all this talk about same sex marriage, there is no such thing. Same sex marriages give us idiots like that man standing over there who don't know what the hell they are. Some one needs to take a hammer and bust him up against the side of the head. I am sick and tired of this. You've got all these churches around here that say this is okay, but the only reason they say it is okay is so that all these homosexual fagots will come to their church and put money in their pot! So they can turn around and buy candy bars to molest the little boys that go to their church. That is called economics.

Some day the Supreme Court may hold that a state is authorized to ban, not the preaching of white (or black)

supremacy, but the trademark and the trade dress of the Ku Klux Klan regarded as fighting words and signs by virtue of their history and connotations. But that is an issue for another day and a different forum.

The judgment is reversed with instructions to grant the plaintiff relief consistent with this opinion.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*