MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiff,

v.

Timothy J. O'CONNOR, Defendant.

No. 00 C 2065.

United States District Court,
N.D. Illinois,
Eastern Division.

May 19, 2000.

Terrencè Patrick Canade, Kevin Patrick McJessy, Steven Todd Whitmer, Andrew R. Gifford, Lord, Bissel & Brook, Chicago, IL, for plaintiff.

Jerry Michael Santangelo, H. Nicholas Berberian, Neal, Gerber & Eisenberg, Chicago, IL, for defendant.

## ORDER

ROSEMOND, United States Magistrate Judge.

Before the Court is plaintiff's *"Emergency Motion For Expedited Discovery Schedule And For Preliminary Injunction Hearing"* and *"Motion For Deposition"* of defendant Timothy J. O'Connor within the next ten days. ***Both motions are denied.*** A preliminary injunction hearing is set for September 12th, 2000 at 10 A.M.

At the outset of the litigation, plaintiff Merrill, Lynch, Pierce, Fenner and Smith, Inc. sought issuance of a temporary restraining order prohibiting defendant Timothy J. O'Connor, who quit his job at Merrill Lynch on March 31, 2000, from soliciting any business from or initiating any contact with any client of Merrill Lynch serviced by O'Connor or known to O'Connor while he was employed by Merrill Lynch, accepting any business or account transfers from any of these customers, or using any information contained in the files of Merrill Lynch. *Merrill Lynch* was *unsuccessful in this regard.*

As noted by the District Judge, the temporary restraining order sought by Merrill Lynch would have essentially prohibited "O'Connor from doing any business with anyone he ever did business with at Merrill Lynch even if the customer somehow found O'Connor at his new employer, which would be unlikely since Merrill Lynch ask[ed] th[e] Court to prevent O'Connor from even telling his former customers that he ha[d] gone to a new employer." [1] Taking such an extreme position is in and of itself *indicia* of bad faith on the part of Merrill Lynch.

In any event, upon due consideration given to the evidentiary presentation made by Merrill Lynch in support of its temporary restraining order motion, the District Judge found and concluded that Merrill Lynch had failed to demonstrate a substantial likelihood of success on the merits. In addition, the District Judge found that Merrill Lynch had not met its burden of proving that it would be irreparably harmed without the issuance of an injunction, or that the public interest, or balance of harms was in its favor. She concluded that with respect to irreparable harm, "the amount of commissions generated from clients leaving Merrill Lynch to go with O'Connor to his new job [could] be readily ascertained." [2] Continuing in the same vein, she reasoned that:

> Even if there [was] the possibility of irreparable harm from the loss of customers to which Merrill Lynch claim[ed] ownership, the potential harm to O'Connor from a prolonged loss of all his customers would seem to be much greater than the potential loss to Merrill Lynch of customers who may or may not choose to deal with another Merrill Lynch broker. Finally, as numerous courts have noted, the relationship between broker and client is, in many cases at least, personal and, particularly in a time of uncertain markets, they may be harmed, or feel that they will be harmed, by being deprived of that relationship. ***On this record, the balance of harms does not favor Merrill Lynch.***[3]

As noted above, the overbreadth of the injunctive relief initially sought by Merrill Lynch is *indicia* of bad faith, since by its very overbreadth it prohibits legitimate customer contact by O'Connor, particularly, with those customers with whom he had had a pre-existing brokerage relationship long before his association with Merrill Lynch, and who chose and will choose to follow him to his new employment, as is their right. Obviously, customers who had a pre-existing relationship with O'Connor prior to his association with Merrill Lynch constitute a customer base that was developed at no cost to, or at best little cost or expenditure by Merrill Lynch. Thus, the initial injunctive relief sought by Merrill Lynch reflects not a con-

---

**1.** April 12, 2000 *Order* of the District Judge (Docket Entry No. 22).

**2.** April 12th *Order.*

**3.** April 12th *Order* (Docket Entry No. 22) (emphasis added).

cern for protecting itself from unlawful theft of customers, but more a goal of teaching O'Connor and any individuals who might act as he has to obtain better employment benefits and opportunities elsewhere "a lesson".

It would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit O'Connor from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should the customers wish to contact him:

> As Judge Gettleman noted[4], otherwise customers with longstanding trust in their brokers with immediate need of advice would not be able to contact them.[5]

Certainly, when the markets were as volatile as they were in the weeks surrounding the filing of Merrill Lynch's complaint, an informational announcement regarding O'Connor's new employment was essential. Had Merrill Lynch been truly concerned about the welfare of its customers, it would have circulated such an announcement on its own.

In none of its moving papers before the Court does Merrill Lynch state the it has any standard office announcement notice of any nature whatsoever for brokers who leave its employ which tells the broker's customers when he is expected to leave, the brokerage firm to which he is going, at what telephone number he can be reached, if desired, and who at Merrill Lynch is taking over the client's account. Failure to have such a written announcement, or effective oral recitation or other similar notice procedure in place, suggests bad faith on the part of Merrill Lynch. If Merrill Lynch were truly concerned about its clients' welfare, it would have such a notification system in place. Its clients have a right to know such matters. And, employees have a right to seek and obtain the best employee benefits and opportunities that the marketplace can offer.

The evidence submitted by Merrill Lynch at the hearing on its TRO motion is further *indicia* of the bad faith force behind its charges against O'Connor:

> [T]he [evidence] indicates [that] the persons upon which Merrill Lynch ... [relies] to support its argument that O'Connor was soliciting Merrill Lynch customers were in fact **close friends** of O'Connor. One of the two about which Merrill Lynch complains is, according to O'Connor, a family member of people he had talked to, **people with whom he had a relationship going back to his high school years. The other was someone with whom he also had a personal relationship, and with whom he had a standing luncheon engagement.**[6]

As noted by the District Judge, unless O'Connor's affidavit testimony was untrue, it is **inconceivable** that such close friends and high school "chums" would not follow O'Connor to his new employment, or that they would be likely to stay with Merrill Lynch if O'Connor were to be enjoined from doing business with them.[7] Indeed, as noted earlier, the close friends and high school chums were never **originally** Merrill Lynch's clients since O'Connor brought them with him when he came to work at Merrill Lynch. The examples of harm tendered by Merrill Lynch show neither irreparable harm nor unlawful solicitation, but rather Merrill Lynch's harassment goal in bringing the suit against O'Connor.

At the respective hearings on its *"Emergency Motion For Expedited Discovery Schedule And For Preliminary Injunction Hearing"* and *"Motion For Deposition"*, Merrill Lynch essentially reiterated the same arguments that it had made before the District Judge in support of its unsuccessful temporary restraining order motion. The evidence and arguments remained unchanged. And, they were just as unpersuasive then as they were before.

---

**4.** *Merrill Lynch v. Oblon,* (N.D.Ill. Sept. 10, 1999); *Merrill Lynch v. Gurtin,* (N.D.Ill. January 29, 1999).

**5.** April 12th *Order* of the District Judge.

**6.** April 12th *Order* (emphasis added).

**7.** April 12th *Order.*

It appears undisputed that under the rules of the National Association of Securities Dealers and contracts executed by the parties that the parties are bound to arbitrate the dispute between them. And, pursuant to the National Association of Securities Dealers Code of Arbitration, the defendant has petitioned for the selection of an arbitration panel. Under the rules, the parties have already begun the process of exchanging and discussing their respective lists of proposed arbitrators. If the parties are unable to agree upon and assemble a panel of arbitrators by May 24th, under the NASD rules, a panel will be selected for them within a few days thereafter. Once an arbitration panel is selected, defendant will move for a stay of all proceedings in federal court, which is likely to be granted. Once an arbitration panel has been assembled, injunctive relief is inappropriate. Notwithstanding that the arbitration process is well on its way, Merrill Lynch still seeks expedited discovery, and a preliminary injunction hearing *before* the empaneling of an NASD arbitration panel. On this record, its pursuit in this regard is further *indicia* of bad faith.

Plaintiff's *"Emergency Motion For Expedited Discovery Schedule"* and *"Motion For Deposition"* of defendant Timothy J. O'Connor seek unfettered and unrestrained written discovery, and a limitless deposition of the defendant. No effort whatsoever is made to tailor the discovery sought to the time restraints proposed by the plaintiff, or to the specific issues that will be determined at the preliminary injunction hearing. Indeed, no attempt is made to articulate those issues.

*"Plaintiff's First Set Of Interrogatories To Defendant"* contains numerous requests that are irrelevant to any potential issue in the case, overbroad on their face, or otherwise seemingly propounded for purposes of harassment. Examples of the same are as follows:

*Interrogatory No. 1:*

1.  Please identify and describe any records, documents, or information pertaining to any Merrill Lynch Account that O'Connor provided to Dean Witter and state:

    (a) The date(s) on which O'Connor provided such records, documents or information to Dean Witter;

    (b) Whether such records, documents, or information were used in any way by Dean Witter or O'Connor to prepare mailings O'Connor sent to the Merrill Lynch Accounts; and

    (c) Whether such records, documents, or information are currently in Dean Witter's possession or in any database maintained by Dean Witter:[8]

The above-noted interrogatory is unrestrained as to time and scope and, therefore, seeks wholly irrelevant matter.

*Interrogatory No. 3:*

3.  State the names and office locations of any persons (including headhunters) who had any involvement in the hiring of O'Connor at Dean Witter, including, without limitation, any persons with whom O'Connor interviewed and the dates on which such interviews took place.[9]

The above-noted interrogatory is pure harassment. Dean Witter is not a party in the lawsuit. No issue or potential issue in the case could possibly center or focus on Dean Witter's hiring of the defendant, or the defendant's job hunting processes.

*Interrogatory No. 4:*

4.  Identify O'Connor's current supervisors and subordinates at Dean Witter.

The above noted interrogatory seeks wholly irrelevant matter. O'Connor's supervisors and subordinates at Dean Witter are not parties to this action. This request is pure harassment of O'Connor's bosses.

*Interrogatory No. 5:*

5.  State in detail all aspects of O'Connor's compensation package at Dean Witter,

---

8.  Exhibit C, at 4, *"Defendant's Opposition To Plaintiff's Emergency Motion For Expedited Discovery Schedule And For A Preliminary Injunction Hearing."*

9.  Exhibit C, at 5.

including up-front loans, commission pay-outs, asset payments, back-end bonuses or payments, salary guarantees, etc.

At the outset, the request is overbroad in scope and time and, therefore, seeks wholly irrelevant matter. O'Connor's salary or compensation package or arrangements with Dean Witter have nothing to do with the lawsuit. Even if O'Connor received an increase in salary due to the number of individuals he soundly expects to follow him from Merrill Lynch to Dean Witter, such evidence would not be probative of whether or not he had unlawfully solicited Merrill Lynch's clients. That some clients will follow him to his new employment is to be expected, particularly, of those that had had a pre-existing relationship with O'Connor prior to his being hired by Merrill Lynch. Indeed, it is a reasonable expectation.

Before O'Connor joined the ranks of Merrill Lynch, he was a broker with the I.D.S. brokerage firm. Assertedly, while with I.D.S., O'Connor developed his book of business there. When he came to Merrill Lynch, assertedly, 90% of his customer base consisted of individuals who were his clients at I.D.S. If these people followed him from I.D.S. to Merrill Lynch, they undoubtedly will follow him to Dean Witter. If the customers were not solicited, and otherwise leave Merrill Lynch voluntarily, they are free to do so, and Merrill Lynch can not prevent them from doing so. The key issue is what, if anything, did the defendant do prior to or after his departure from Merrill Lynch that amounted to unlawful solicitation. Whether he had a salary related motive for doing so strikes us as being at most tenuously relevant. Certainly, such a discovery pursuit ought not to be the basis for or the subject of expedited discovery.

### Interrogatory No. 6:

6. State whether Dean Witter and O'Connor ever discussed potential litigation by Merrill Lynch (outside the presence of counsel) prior to the time O'Connor was hired by Dean Witter, and, if so:

  (a) identify all persons who participated in these discussions;

  (b) state the dates said discussions occurred; and

  (c) state whether Dean Witter agreed to pay money to indemnify and/or resolve litigation and, if so, in what amount.[10]

The above-quoted interrogatory seeks wholly irrelevant matter. It too suggests harassment.

*"Plaintiff's First Request For The Production Of Documents To Defendant"* fares no better than its *"First Set Of Interrogatories To Defendant"*. The request contains ten document requests. Document Request Nos. 1 through 6 are overbroad and otherwise seek wholly irrelevant matter.[11] Document Request No. 7 seeks information that is in Merrill Lynch's possession. Merrill Lynch should know which of its ·customers have transferred their accounts to Dean Witter. It is not the type of discovery request that should be the subject of expedited discovery, and its inclusion smacks of harassment. The remaining document requests speak for themselves in terms of pure harassment, *to-wit:*

*Document Request No. 8:* All letters, memoranda, telephone logs, account forms, and other DOCUMENTS which reflect contact with any MERRILL LYNCH ACCOUNT on behalf of Dean Witter during the year 2000.

*Document Request No. 9:* All letters, memoranda, telephone logs, account forms, and other DOCUMENTS which reflect contact in the year 2000 on behalf of Dean Witter with any person who was NOT a MERRILL LYNCH ACCOUNT.

*Document Request No. 10:* All statements, reports, memoranda, notes, and

---

10. Exhibit C, at 5.

11. Exhibit D, at 3 and 4, *"Defendant's Opposition To Plaintiff's Emergency Motion For Expedited*

*Discovery Schedule And For A Preliminary Injunction Hearing."*

other DOCUMENTS which reflect all accounts for which O'Connor has responsibility at Dean Witter or for which O'Connor receives any compensation from Dean Witter.[12]

The above-quoted document requests are so overbroad in scope that they seek wholly irrelevant matter. Indeed, their focus is so misdirected that they can only be viewed as intentional harassment of both O'Connor and his new employer, Dean Witter, a non-party to this action. *Via* its discovery requests, Merrill Lynch seems more intent on trying to obtain information to provide a basis for a colorable charge against Dean Witter, rather than finding out what happened between defendant O'Connor and Merrill Lynch's clients.

Since *all* of the document requests propounded by Merrill Lynch seek irrelevant matter, and virtually all of the interrogatories propounded seek matter irrelevant to any possible injunction issues that may arise in the case, Merrill Lynch clearly does not need such discovery at all, much less on an expedited basis. We find the overbreadth of the discovery requests, particularly, as to time and scope, and the misfocus of the issues, strongly suggestive of harassment.

■ Federal Rule of Civil Procedure 26 gives a trial court wide discretion to manage the discovery process. Expedited discovery is not the norm. Plaintiff must make some *prima facie* showing of the *need* for the expedited discovery. *No such showing has been made here by Merrill Lynch.*

■ Given that the record to date shows more intent to harass than anything else, expedited discovery is simply not appropriate. Given that the record to date suggests that the charges leveled by Merrill Lynch against O'Connor are "trumped up" or stretched to make a colorable suit against him, expedited discovery is highly inappropriate. Given that much of the discovery sought is irrelevant, expedited discovery is not appropriate. Given that empanelment of a National Association of Securities Dealers arbitration panel is imminent, and the fact that interrogatories and depositions are not permitted in such arbitration proceedings, expedited discovery is all the more inappropriate on this record, because it appears that Merrill Lynch is attempting the proverbial "end-run" around the arbitration process to which it is contractually bound.

■ It must be remembered that the requirement that a plaintiff obtain leave of court for expedited discovery serves to maintain the fairness of civil litigation.[13] As we have emphasized, courts should not grant such leave without some showing of the necessity for the expedited discovery.[14] Courts must also protect defendants from unfair expedited discovery.[15]

We are well aware of the *Notaro* factors frequently used by some courts to consider whether expedited discovery is appropriate. The *Notaro* factors are (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between expedited discovery and avoidance of the irreparable injury; and (4) some evidence that injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.[16] The factors to be considered for issuance of a preliminary injunction are much the same, *to-wit:* (1) irreparable injury coupled with an inadequate remedy at law; (2) the plaintiff's likelihood of success; (3) the harm to the defendant if granted balanced against harm to the plaintiff if not granted;

---

**12.** Exhibit D, at 5, *"Defendant's Opposition To Plaintiff's Emergency Motion For Expedited Discovery Schedule And For A Preliminary Injunction Hearing".*

**13.** *Notaro v. Koch,* 95 F.R.D. 403, 405 (S.D.N.Y. 1982)

**14.** *Id.*

**15.** *Id.*

**16.** *Id.*

and (4) the public interest.[17] Three of the four *Notaro* factors are identical to the preliminary injunction factors. The only differences in the *Notaro* analysis are that causation is considered and the public interest is not considered.

We have not embraced the *Notaro* analysis, because we do not find it appropriate. In *Notaro*, the plaintiffs were seeking a permanent injunction.[18] The plaintiffs sought expedited discovery *in lieu of* a preliminary injunction hearing. In such circumstances, it may well have made sense to utilize the preliminary injunction factors to consider whether expedited discovery was appropriate.

On the other hand, where, as here, a plaintiff seeks expedited discovery in order *to prepare for a preliminary injunction hearing,* it does not make sense to use preliminary injunction analysis factors to determine the propriety of an expedited discovery request.[19] Rather, where a plaintiff seeks expedited discovery to prepare for a preliminary injunction hearing, it makes sense to examine the discovery request, as we have done, on the entirety of the record to date and the *reasonableness* of the request in light of all of the surrounding circumstances, similar to what was done in *Philadelphia Newspapers*.[20]

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1. Plaintiff's *"Emergency Motion For Expedited Discovery Schedule And For Preliminary Injunction Hearing"* is hereby denied.

2. Plaintiff's *"Motion For Deposition"* is hereby denied.

3. As in any Rule 37 discovery dispute, the successful party is entitled to an award of attorneys' fees, and we award defendant Timothy J. O'Connor his reasonable attorneys' fees necessarily incurred in opposing plaintiff's discovery motions.

4. Attorneys' fees are additionally awarded on the ground that the record to date shows that the plaintiff's discovery motions were completely baseless, and otherwise interposed for purposes of harassment.

5. The preliminary injunction hearing for this cause is hereby set for September 12th, 2000 at 10 A.M.

6. The defendant may file his fee petition within 15 days of the date of this Order. Any opposition to the hourly rate charged or the work performed must be filed 15 days thereafter. Any reply briefs be filed 15 days after that.

7. Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, the parties are given 10 days after being served with a copy of the Order to file exceptions thereto with The Honorable Elaine E. Bucklo. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's Order.[21]

*So Ordered.*

---

**17.** *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir.1997); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir.1997); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994).

**18.** *Notaro*, 95 F.R.D. at 404.

**19.** *See Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*, 1998 WL 404820 at *2 (E.D.Pa. July 15, 1998) (footnote # 1).

**20.** 1998 WL 404820 at *3.

**21.** *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538 (7th Cir.1986). See also, *Provident Bank v. Manor Steel Corporation*, 882 F.2d 258, 261 (7th

Cir.1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's Order).